# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1124 |

| | |
|---|---|
| COMPLETE TITLE: | Matthew W. Murphy,<br>          Plaintiff-Appellant,<br>Wisconsin Power and Light Company,<br>          Involuntary-Plaintiff,<br>     v.<br>Columbus McKinnon Corporation,<br>          Defendant-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 18, 963 N.W.2d 837
PDC No:2021 WI App 61 - Published

| | |
|---|---|
| OPINION FILED: | December 28, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 12, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Sauk |
| JUDGE: | Michael P. Screnock |

JUSTICES:
ROGGENSACK, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined except for ¶¶38 and 41. KAROFSKY, J., filed a concurring opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined. HAGEDORN, J., filed an opinion concurring in part and dissenting in part, in which ZIEGLER, C.J., and REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Larry J. Britton, Shannon M. Trevithick, Debora F. Pagel, Esq., Kevin J. English, Erin E. Connare,* and *Britton & Associates, S.C.,* Mequon, and *Phillips Lytle LLP,* Buffalo. There was an oral argument by *Kevin J. English,* introduced by *Shannon M. Trevithick.*

For the plaintiff-appellant, there was a brief filed by *Douglas J. Phebus, Victor M. Arellano,* and *Arellano & Phebus, S.C.* There was an oral argument by *Douglas J. Phebus.*

An amicus curiae brief was filed by *Jesse B. Blocher* and *Habush, Habush, & Rottier, S.C.,* Waukesha, for the Wisconsin Association for Justice. There was an oral argument by *Jesse B. Blocher.*

**2022 WI 109**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1124
(L.C. No. 2016CV51)

STATE OF WISCONSIN    :    IN SUPREME COURT

**Matthew W. Murphy,**

        **Plaintiff-Appellant,**

**Wisconsin Power and Light Company,**

        **Involuntary-Plaintiff,**

      **v.**

**Columbus McKinnon Corporation,**

        **Defendant-Respondent-Petitioner.**

**FILED**

**DEC 28, 2022**

Sheila T. Reiff
Clerk of Supreme Court

ROGGENSACK, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined except for ¶¶38 and 41. KAROFSKY, J., filed a concurring opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined. HAGEDORN, J., filed an opinion concurring in part and dissenting in part, in which ZIEGLER, C.J., and REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed*.

¶1 PATIENCE DRAKE ROGGENSACK, J. We review a published decision of the court of appeals[1] that reversed in part and

---

[1] Murphy v. Columbus McKinnon Corp., 2021 WI App 61, 399 Wis. 2d 18, 963 N.W.2d 837.

affirmed in part the circuit court's[2] grant of summary judgment for defendant Columbus McKinnon Corporation ("CMC"). We begin with the common law that applied to a design defect and then interpret, for the first time, Wis. Stat. § 895.047 (2019-20)[3] following the legislature's creation of this state's product liability statute in 2011. We then apply the statute to the facts of this case to affirm the court of appeals' mandate and remand for further proceedings.

¶2   In interpreting Wisconsin's product liability statute when the claim is for a defective design, we conclude as follows: (1) Wis. Stat. § 895.047(1)(a) requires proof of a more safe, reasonable alternative design the omission of which renders the product not reasonably safe; (2) proof that the consumer-contemplation standard[4] as set out in § 895.047(1)(b) (for strict liability claims for a defective design) has been met; and (3) proof that the remaining three factors of a § 895.047(1) claim have been met. The statute's plain language is clear in showing that the legislature codified the common law consumer-contemplation standard in § 895.047(1)(b). We disagree with the court of appeals' conclusion that the legislature

---

[2] The Honorable Michael P. Screnock of Sauk County, presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

[4] The consumer-contemplation standard is sometimes referred to herein and in our case law as the consumer-contemplation test.

discarded the consumer-contemplation test by incorporating the risk-utility balancing test.  We also decline to adopt comment f of Restatement (Third) of Torts §2, upon which the court of appeals relied.  With a clear understanding of the requirements that a plaintiff must establish, and considering the multiple genuine disputes of material fact, which we explain below, we affirm the court of appeals in reversing summary judgment and remand to the circuit court for further proceedings.

## I.   BACKGROUND

¶3   As a society, we owe a great deal to those who ensure electricity reaches our homes, work places, and public institutions.  But that electricity reaches us, thanks in large part, due to the utility line technicians who perform a dangerous job.  The United States Bureau of Labor Statistics recorded 2,310 nonfatal occupational injuries and illnesses for electrical power-line installers and repairers in 2013.[5] Plaintiff Matthew Murphy, a line technician for Wisconsin Power & Light Company,[6] was one of those injured workers, sustaining substantial injury after a thirty-foot utility pole fell, struck, and came to rest atop him while Murphy attempted to load

---

[5] Bureau of Labor Statistics, U.S. Dep't of Labor, Injuries and Illnesses of Line Installers and Repairers (Feb. 28, 2018), https://www.bls.gov/opub/ted/2018/injuries-and-illnesses-of-line-installers-and-repairers.htm (last visited Dec. 19, 2022).

[6] Murphy "held the positions of Line Technician Apprentice, Line Technician, and Technical Assistant."   R.  44  at  52 (Wisconsin Power & Light Company Response to Interrogatory No. 15).

used utility poles from the ground onto a trailer bed on May 14, 2013.[7]

¶4 Utility workers lift poles using a truck-mounted boom featuring a winch, to which workers fix tongs that attach to the pole to enable secure lifting. Murphy's employer, Wisconsin Power and Light Company (WPL), provided regular training to its linemen regarding the appropriate procedure for attaching tongs. At least two styles of tongs were regularly on the trucks at the time of Murphy's injury, including: "Dixie" style tongs and "Hogg-Davis" jaw-style tongs. Dixie tongs resemble old-fashioned ice tongs, and are attached by placing a pointed prong on either side of the pole. Once the tongs are lifted upward, Dixie tongs close in a manner akin to scissors, and the force of upward lifting typically draws the points further into the pole against which the tongs are placed. Different from the two-prong Dixie tongs, Hogg-Davis jaw-style tongs feature multiple (often three) teeth along the inside of each side of the tongs. Jaw-style tongs clamp around the pole, providing six surfaces to contact the pole during lifting.

¶5 When an individual lifts poles alone, line technicians are trained to attach the lifting tongs to the winch and then to the pole. Placement on the pole is paramount, and line

---

[7] On the day of the accident, Murphy's "original job assignment was to string wire at a different location. . . . Plaintiff's work assignment changed to pick up poles that had been removed from the ground and left lying to the side of Golf Course Road." R. 44 at 52 (Wisconsin Power & Light Company Response to Interrogatory No. 16).

technicians must be aware of two critical points for proper tong placement: (1) the balance point relative to the length of the pole; and (2) the attachment point as relative to the circumference of the pole. Regarding the balance point, line technicians are trained to place the lifting implement slightly off of the balance point so that the higher "light" end is toward the lineman. This placement prevents unpredictable teetering in a pole lifted at the exact balance point, and it ensures the lineman can push down on the higher end of a slightly-askew pole, rather than lift up on the lower end. Because poles are typically tapered, the balance point is not necessarily in the exact middle of the pole. As for the attachment point on the circumference, the tongs should grasp the lower third of the pole's circumference, as viewed by cross-section, to prevent slipping or falling that is more likely to occur from attachment nearer to the middle or top-third points.

¶6    After selecting and attaching the desired tongs, line technicians are trained to follow certain protocol while loading poles from the ground onto a trailer bed. They are trained to perform a test lift to ensure the lifting implement does not slip or otherwise fail, and to test the attachment point.[8] Line technicians then lower and make adjustments to the tongs' positioning, as needed. Having verified the tongs are attached securely and at the appropriate placement, line technicians then raise the hoist high enough to clear the sides of the truck bed.

---

[8] Test lifts entail lifting the hoist anywhere from six inches to two feet.

¶7 Accordingly, line technicians must lift the pole at least somewhat higher than six feet to ensure both ends of the pole clear the side rails of the truck. They are trained not to lift the hoist "above the lineman's head." They are similarly trained not to stand under suspended poles, or to raise a load overhead. However, line technicians must remain in close proximity to the suspended poles, as they are trained to "right" an askew pole by placing downward pressure on the upper end to ensure the pole remains relatively horizontal to the ground.

¶8 While ideally line technicians work in pairs to perform this task, utility companies acknowledge this is not always feasible, and they also have trained them for independent work. Line technicians have the option to wear a waist belt that can remotely control the hoist. This device allows line technicians to operate both the boom and winch, as well as place as-needed pressure to right a pole.

¶9 Murphy had worked as a line technician for approximately six years and had loaded and unloaded utility poles numerous times. On the date of his injury, Murphy and a colleague worked as a pair to load used utility poles from the side of the road to a trailer. However, due to the poles' location, the pair decided to bring the utility poles to the location of the boom and hoist truck. As Murphy's coworker dragged poles toward Murphy with one truck, Murphy independently loaded poles onto a trailer using a waist belt and a separate truck with the boom. Murphy attached Dixie tongs to an old,

weathered, hard pole. Once hoisted in the air, the pole came loose from the tongs and struck Murphy, injuring him severely.

¶10 Murphy has no recollection of the accident due to his injuries; his coworker did not witness the accident as he was moving a truck. The only two eyewitnesses were drivers waiting for Murphy's colleague to move the truck out of the way to reopen traffic after dragging a pole to Murphy.

¶11 The Dixie tongs Murphy used on the date of his accident were manufactured by defendant CMC. CMC is aware line technicians use the Dixie tongs to lift poles, and it marketed the tongs as "pole tongs" in its own advertisements. Murphy's employer purchased the Dixie tongs intending to use them to lift poles. Murphy brought a products liability lawsuit against CMC alleging both strict product liability for a design defect under Wis. Stat. § 895.047(1), relying on the Hogg-Davis jaw-style design as providing a more safe alternative design, and as support for a common law claim of negligent design.[9]

---

[9] Initially, Murphy also alleged strict product liability claims on the theory of failure to warn and, in addition to the alternative design of "Hogg-Davis" jaw-style tongs, a second alternative choker-style design. Additional defendants included CM Hydraulic Tool Supply, Inc., from whom Murphy's employer purchased the CMC "Dixie" tongs, and CM Hydraulic's insurer, United Fire & Casualty. Murphy's former employer, Wisconsin Power and Light Company, is an involuntary plaintiff in this lawsuit. In September 2018, Murphy, CM Hydraulic, and United Fire settled for an undisclosed amount. Murphy confirmed his withdrawal of the failure to warn claim at a hearing for summary judgment on December 10, 2018. The court of appeals confirmed Murphy "concedes through silence that he has forfeited and abandoned argument based on this purported alternative [choker-style] design." Murphy, 399 Wis. 2d 18, ¶14. The issue of choker-style tongs was not raised with this court, so we, too,

¶12 Following over two years of discovery, CMC moved for summary judgment. Finding genuine disputes of material fact, the circuit court denied summary judgment and recommended the parties reconvene with their experts to resolve unanswered questions. Four months later, the court denied summary judgment again, reasoning the persistent factual disputes and difficulty in allocating fault did not allow for summary judgment on Murphy's claims or on CMC's defenses. The parties set a trial date for April 2020. Faced with delaying the trial significantly due to the COVID-19 pandemic, the circuit court sua sponte reconsidered CMC's motion for summary judgment at a hearing on motions in limine and granted summary judgment for CMC. Murphy appealed.

¶13 The court of appeals reversed in part and affirmed in part. Agreeing with the circuit court that there was insufficient evidence to support Murphy's second alternative choker-design theory, the court of appeals affirmed summary judgment on that claim in favor of CMC. Regarding the primary alternative design theory of Hogg-Davis jaw-style tongs, however, the court of appeals concluded there were genuine disputes of material fact, and reversed summary judgment.[10] Lastly, the court of appeals acknowledged that multiple genuine

_____

treat the second alternative design theory as abandoned.

[10] CMC also raised a question regarding admissibility of expert witness testimony on review, which it did not raise at the court of appeals. As this question does not properly appear before us, we decline to address it, as is our prerogative. State v. Mark, 2006 WI 78, ¶11, 292 Wis. 2d 1, 718 N.W.2d 90.

disputes of material fact precluded it from apportioning negligence to affirm summary judgment for CMC or from addressing CMC's other fact-specific defenses. CMC sought review before us, which we granted.

## II. DISCUSSION

### A. Standard of Review

¶14 This case presents a question of statutory interpretation, which we independently decide. Andruss v. Divine Savior Healthcare Inc., 2022 WI 27, ¶24, 401 Wis. 2d 368, 973 N.W.2d 435.

¶15 CMC asks us to reinstate the circuit court's grant of summary judgment in its favor. We review summary judgment independently. In so doing, we decide whether there are genuine issues of material fact, but we do not resolve any disputed factual issues. Id., ¶¶40, 42. Essentially, we apply the same methodology as the circuit court, although we benefit from the decisions of both the circuit court and the court of appeals. Butler v. Advanced Drainage Sys., Inc., 2006 WI 102, ¶17, 294 Wis. 2d 397, 717 N.W.2d 760.

### B. Development of Wisconsin's Product Liability Law

¶16 In resolving the issues raised in this case, we review the development of Wisconsin's product liability law as established in the common law and the parties' positions regarding the interpretation of Wis. Stat. § 895.047(1), followed by our statutory interpretation.

### 1. Common Law[11]

¶17 As we begin, we note that the better part of the last century featured changes to the landscape of strict product liability. Dippel v. Sciano, 37 Wis. 2d 443, 449, 155 N.W.2d 55 (1967). While at one point an injured person needed to demonstrate privity of contract to establish liability, United States jurisdictions, including Wisconsin, dispensed with that requirement decades ago. Id. at 450. As we moved away from grounding defective product claims in contract, we established manufacturer and supplier liability in negligence——in tort. Id. at 451-52, relying on Cohan v. Associated Fur Farms, Inc., 261 Wis. 584, 589, 53 N.W.2d 788 (1952) and Smith v. Atco Co., 6 Wis. 2d 371, 383-84, 94 N.W.2d 697 (1959).[12]

¶18 In Dippel, we voiced a desire to move more slowly in developing our products liability law than other jurisdictions. Dippel, 37 Wis. 2d at 453. But, in the absence of statutory guidance, we adopted a rule of strict liability in accord with

---

[11] "Common law" has been defined as "The body of law derived from judicial decisions." Black's Law Dictionary 293 (8th ed. 2004).

[12] Smith v. Atco Co., 6 Wis. 2d 371, 383-84, 94 N.W.2d 697 (1959) ("The question of liability should be approached from the standpoint of the standard of care to be exercised by the reasonably prudent person in the shoes of the defendant manufacturer or supplier. Such an approach will eliminate any necessity of determining whether a particular product is 'inherently dangerous.' If a manufacturer or supplier is hereafter to be relieved from liability as a matter of law by the courts, such result should be reached on the basis that there was no causal negligence established against the defendant rather than that the product was not inherently dangerous.").

that set forth in § 402A of the Restatement (Second) of Torts
(Am. Law Inst. 1965).  Id. at 453, 458-59, 462.[13]  Section 402A
states:

> (1) One who sells any product in a defective
> condition unreasonably dangerous to the user or
> consumer or to his property is subject to liability
> for physical harm thereby caused to the ultimate user
> or consumer, or to his property, if
>
> > (a) The seller is engaged in the business of
> > selling such a product, and
> >
> > (b) It is expected to and does reach the user or
> > consumer without substantial change in the
> > condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies
> although
>
> > (a) The seller has exercised all possible care in
> > the preparation and sale of his product, and
> >
> > (b) The user or consumer has not bought the
> > product from or entered into any contractual
> > relation with the seller.

Restatement (Second) of Torts § 402A.

¶19  By adopting Restatement (Second) of Torts § 402A, we
set out five requirements that a plaintiff must prove to prevail
in a strict liability products claim.[14]  Id. at 460.  At the same

---

[13] "Strict liability in tort for the sale of a defective
product unreasonably dangerous to an intended user or consumer
now arises in this state by virtue of a decision of this court
[as opposed to by statute]."  Dippel v. Sciano, 37 Wis. 2d 443,
462, 155 N.W.2d 55 (1967).

[14] "From a reading of the plain language of the rule, the
plaintiff must prove (1) that the product was in defective
condition when it left the possession or control of the seller,
(2) that it was unreasonably dangerous to the user or consumer,
(3) that the defect was a cause (a substantial factor) of the
plaintiff's injuries or damages, (4) that the seller engaged in

time, we acknowledged available defenses of assumption of risk and contributory negligence when a plaintiff failed to exercise reasonable care. Id. at 459-60. We also acknowledged that the product must be "reasonably used for the purpose for which it was intended," and that the "abuse or alteration of the product may relieve or limit liability."[15] Id. at 460.

---

the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it." Id. at 460.

[15] However, by keeping traditional defenses such as comparative negligence in adopting Restatement (Second) of Torts § 402A, Wisconsin did not wholesale adopt strict liability. Rather, as one justice proclaimed, this court merely adopted a manner to establish "negligence as a matter of law and such negligence is subject to the ordinary rules of causation and the defense applicable to negligence. While the [Restatement of Torts (Second) § 402A], imposes a strict or absolute liability regardless of the negligence of the seller, we do not." Id. at 464 (Hallows, J., concurring) (underscored sentence adopted in Schuh v. Fox River Tractor Co., 63 Wis. 2d 728, 735, 218 N.W.2d 279 (1974)). By establishing the requisite elements in § 402A, a Wisconsin plaintiff was "relieved of the burden of proving specific acts of negligence by the manufacturer who is then deemed negligent per se." Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 69 Wis. 2d 326, 330, 230 N.W.2d 794 (1975).

See also, Greiten v. La Dow, 70 Wis. 2d 589, 600 n.1, 235 N.W.2d 677 (1975) (Heffernan, J. concurring), dismissing the language in Arbet v. Gussarson, 66 Wis. 2d 551, 555-56, 225 N.W.2d 431, that suggests § 402A merely shifted the burden of negligence (stating, "Under this doctrine [of strict products liability], where plaintiff shows that a manufacturer markets a product in a 'defective condition' which is 'unreasonably dangerous to the user,' the manufacturer then has the burden to prove lack of negligence.").

12

¶20 In Vincer, we clarified that the appropriate test to employ as to whether a product is "unreasonably dangerous," as required under § 402A(1) of the Restatement (Second), is the consumer-contemplation test. Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 69 Wis. 2d 326, 332, 230 N.W.2d 794 (1975). As such, we established that the consumer-contemplation test for an unreasonably dangerous defect "depends []on the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product." Id. The test is objective and not dependent on a particular injured consumer's knowledge. Id. However, we also reasoned that a particular injured consumer's knowledge of the dangerous condition of a product may be "evidence of contributory negligence under the circumstances." Id. We then discussed comments g (defective condition) and i (unreasonably dangerous) to § 402A in Vincer, id. at 330, 331, and we concluded that "a product can be deemed defective and unreasonably dangerous based solely on consumer expectations." Green v. Smith & Nephew AHP, Inc., 2001 WI 109, ¶4, 245 Wis. 2d 772, 629 N.W.2d 727.

¶21 Accordingly, the consumer-contemplation test was employed to assess whether a product was "unreasonably dangerous" as well as whether it was in a "defective condition." Stated otherwise, a litigant was required to show that the product design was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics." Vincer, 69 Wis. 2d at 331 (quoting

13

Restatement (Second) of Torts § 402A cmt. i). We have reaffirmed that "Wisconsin is committed to the consumer-contemplation test for determining whether a product is defective." Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 368, 360 N.W.2d 2 (1984); see also Green, 245 Wis. 2d 772, ¶46.

¶22 As the law in products liability developed, the American Law Institute introduced the Restatement (Third) of Torts: Products Liability, in 1998. In pertinent part, Section 2 states:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design . . . .
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor . . . and the omission of the alternative design renders the product not reasonably safe;
>
> (c) is defective because of inadequate instructions or warnings . . . .

Restatement (Third) of Torts § 2.

¶23 Section 2 of the Third Restatement separated products liability claims into three categories: "manufacturing defects, design defects, and defects based on failure to warn." Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 2009 WI 78, ¶17, 319 Wis. 2d 91, 768 N.W.2d 674. CMC has argued that § 2(b)

14

replaced the consumer-contemplation test with the risk-utility test as the standard for judging whether a product is in a defective condition. We repeatedly have declined invitations to adopt the Restatement (Third) of Torts § 2. See Sharp v. Case Corp., 227 Wis. 2d 1, 19, 595 N.W.2d 380 (1999); Green, 245 Wis. 2d 772, ¶74.[16]

¶24 While parties did not invite this court to adopt the Restatement (Third) of Torts § 2 in Godoy or Horst, the separate writings in both cases, issued the same day in 2009, expounded the merits and deficiencies of both § 402A of Restatement (Second) and § 2(b) of the Restatement (Third).[17] Godoy, 319 Wis. 2d 91, Horst v. Deere & Co., 2009 WI 75, 319 Wis. 2d 147, 769 N.W.2d 536.

¶25 In 2011, the legislature created Wis. Stat. § 895.047 as part of Act 2, which altered the landscape of Wisconsin's product liability law. Accordingly, § 895.047 is the first statute to guide the judiciary in product liability claims in this state. The statute, now at issue, establishes what a plaintiff must show in order to prove a claim of strict

---

[16] See also Haase v. Badger Mining Corp., 2004 WI 97, ¶23, 274 Wis. 2d 143, 682 N.W.2d 389 (declining to adopt Restatement (Third) of Torts § 5).

[17] The parties point out that despite the fact that four Justices professed a preference for the Restatement (Third) § 2(b) and spoke favorably of adopting it, the court did not do so in either case. One of the four Justices did not participate in either Godoy (Justice Roggensack) or Horst (Justice Ziegler). Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 2009 WI 78, 319 Wis. 2d 91, 768 N.W.2d 674; Horst v. Deere & Co., 2009 WI 75, 319 Wis. 2d 147, 769 N.W.2d 536.

15

liability for a design defect. This case presents the first opportunity for judicial statutory interpretation of § 895.047 since its creation. We pause briefly to summarize the parties' arguments regarding the statute's meaning.

### 2. Parties' Arguments

¶26 CMC urges this court to read Wis. Stat. § 895.047 as a wholesale adoption of the Restatement (Third) of Torts' risk-utility test as complete replacement of the common law consumer-contemplation test. CMC interprets the separate writings in Godoy and Horst as directives from the court to the legislature, and suggests the legislature adopted the entire Restatement (Third) of Torts § 2(b) in response. CMC argues the identical language between a large portion of the Restatement (Third) § 2(b) and one of the five paragraphs of § 895.047(1) must, therefore, mean that the legislature did away with decades of common law in a few short strokes of the pen. In asserting Wisconsin adopted the Restatement (Third) of Torts when the legislature created § 895.047 in 2011, CMC summarily concludes that Wisconsin has "abandon[ed] any distinction between strict liability and negligence actions."

¶27 Contrastingly, Murphy and amicus argue a straightforward, plain language reading of Wis. Stat. § 895.047. They assert that the Wisconsin Legislature created a unique, hybrid products liability claim that includes five requirements, but which retains the consumer-contemplation test and the distinction between strict liability and negligence as to product claims.

16

¶28  We conclude, as we explain below, Wis. Stat. § 895.047 remains loyal to Wisconsin's roots in the common law consumer-contemplation test.  While § 895.047 appears to borrow language from the Restatement (Third) of Torts, the legislature did not adopt the entirety of § 2, nor did it enact the Restatement's voluminous comments.[18]

### 3.  Wisconsin Stat. § 895.047

¶29  Statutory interpretation "begins with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry."  State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.  It is helpful to revisit the principles of statutory interpretation we set forth in Kalal:

> Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute.  We assume that the legislature's intent is expressed in the statutory language.  Extrinsic evidence of legislative intent may become relevant to statutory interpretation in some circumstances, but is not the primary focus of inquiry. . . .  It is the enacted law, not the unenacted intent, that is binding on the public.  Therefore, the purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect.

Id., ¶44.  "Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." Id., ¶46.  We do not consult extrinsic sources of interpretation

---

[18] Amicus points out Restatement (Third) of Torts § 2 has 18 comments with a total of 11,000 words.  See also Restatement (Third) of Torts § 2.

17

if the statute is unambiguous, although we do read a statute within its context and according to its structure in a plain reading interpretation. Id., ¶¶46, 49.

¶30 With these principles in mind, Wis. Stat. § 895.047(1) states in relevant part:

> [A] manufacturer is liable to a claimant if the claimant establishes all of the following by a preponderance of the evidence:
>
> (a) That the product is defective because it . . . is defective in design. . . . A product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe.
>
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
>
> (c) That the defective condition existed at the time the product left the control of the manufacturer.
>
> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.
>
> (e) That the defective condition was a cause of the claimant's damages.

§ 895.047(1). In so providing, the legislature set a particularized requirement that proof of the requirements of "all" paragraphs in subsec. (1) is necessary to prevail on a defective design claim. The legislature has required meeting statutory criteria in other contexts. See, e.g., County of Dane v. LIRC, 2009 WI 9, ¶¶26, 27, 315 Wis. 2d 293, 759 N.W.2d 571 (directing that when statutory criteria define a condition, all

18

the requirements of the statute must be met in order to prevail). Accordingly, each paragraph following subsec. 1 is an obligation a plaintiff must satisfy to move forward with a defective design, product-liability claim.

¶31 While the language in para. (a) repeats the language from the Restatement (Third) § 2 subsecs. (a), (b), and (c), Wis. Stat. § 895.047(1) paras. (b), (c), (d), and (e) codify the common law Wisconsin courts have developed and applied for decades. For example, § 895.047(1)(b) requires that the "defective condition" renders the product "unreasonably dangerous," which is a part of the common law test. See Tietsworth v. Harley-Davidson, Inc., 2004 WI 32, ¶¶7, 8, 270 Wis. 2d 146, 677 N.W.2d 233 (applying the "unreasonably dangerous" common law test to Harley's TC-88's defective engine). Also, in Kozlowski v. John E. Smith's Sons Co., 87 Wis. 2d 882, 889, 275 N.W.2d 915 (1979), we set out common law factors such as recognizing an "unreasonably dangerous product," "fail[ing] to exercise ordinary care to render its product safe," and "failing to inform users of the defective condition," all in regard to an unreasonably dangerous air compression sausage stuffer).

¶32 In addition, Wis. Stat. § 895.047(6) specifically maintains the criteria for claims of negligence and breach of warranty, claims well-grounded in Wisconsin common law.[19] See

---

[19] Wisconsin Stat. § 895.047(6) states: "Inapplicability. This section does not apply to actions based on a claim of negligence or breach of warranty."

19

Stehlik v. Rhoads, 2002 WI 73, ¶¶52, 53, 253 Wis. 2d 477, 645 N.W.2d 889 (explaining the common law limitations on liability grounded in negligence); Foley v. City of West Allis, 113 Wis. 2d 475, 483, 335 N.W.2d 824 (1983) (explaining common law standard of ordinary care in regard to use of seat belts); Robert H. Lande, A Traditional and Textualist Analysis of the Goals of Antitrust, 81 Fordham L. Rev. 2349, 2366 (citing Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) at 320, explaining the canon of imputed common law meaning as providing that when a statute uses a common-law term without defining it, the statute adopts its common law meaning).

¶33 Paragraph (a) of Wis. Stat. § 895.047(1)(a) mirrors language from Restatement (Third) § 2. It does not adopt the common law standard as § 895.047(b) does. The terms and language of para. (1)(a) are not complex, technical, or difficult to understand. Therefore, our focus must be "primarily on the language of the statute." Kalal, 271 Wis. 2d 633, ¶44. Section 895.047(1)(a), as relevant here to the issue of claimed design defects, establishes two unambiguous requirements that a plaintiff must allege and prove: (1) "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design;" and (2) "the omission of the alternative design renders the product not reasonably safe." Accordingly, the plain language of paragraph (1)(a) is clear. Since the legislature did not direct us further to incorporate or apply a test from the Restatement (Third) of Torts § 2, we conclude "[i]t is the

20

enacted law, not the unenacted intent, that is binding on the public." Id. We interpret para. (1)(a) by its plain language, and conclude that the paragraph is unambiguous; therefore, we cease our inquiry. Id., ¶45.

¶34 However, for the sake of thoroughness, we address another of CMC's arguments on the interpretation of para. (1)(a). CMC asserts the word "reasonable/reasonably" in para. (1)(a) accomplishes at least one, if not all, of the following: (1) it creates the risk-utility balancing test found in Restatement (Third) of Torts § 2(b), and reads in the requirements of comment f ("Design defects: factors relevant in determining whether the omission of a reasonable alternative design renders a product not reasonably safe");[20] (2) it confuses

---

[20] Comment f to Restatement (Third) of Torts § 2 spans three pages of the Restatement, so we relay only the portion the court of appeals relied on:

A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. See Comment g. The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products are factors that may be taken into account. A plaintiff is not necessarily required to introduce proof on all of

21

factfinders; and (3) it blurs any relevant distinction between the statute's terms.

¶35 Regardless of where the language that was employed in Wis. Stat. § 895.047(1)(a) originated, the legislature left no further direction that the statute should be interpreted by superimposing extra-statutory language. Stated otherwise, we will not read Restatement language or Restatement comments into a statute, simply because the legislature selectively adopted some wording from the Restatement.

¶36 As for CMC's argument that the word "reasonable" serves as an impediment to juries, bench and bar alike, we must disagree. Parties adjudicate the issue of reasonability all the time——we need look only to the other claim in this action: negligence. One element of a negligence claim turns on whether the defendant's standard of care fell below that of a "reasonable person." Jankee v. Clark Cnty., 2000 WI 64, ¶9, 235 Wis. 2d 700, 612 N.W.2d 297. To our knowledge, circuit courts, attorneys, and juries have had little trouble understanding and applying the issue of reasonability.[21]

---

these factors; their relevance, and the relevance of other factors, will vary from case to case.

Restatement (Third) of Torts § 2 cmt. f. See also Murphy, 399 Wis. 2d 18, ¶31.

[21] As parties pointed out at oral argument, courts have used the Wis. JI——Civil 3260.1 (2014) for Product Liability under Wis. Stat. § 895.047 for over a decade and there have been "no appeals, no issues." Our own research turned up no results of cases appealing the use or interpretation of the standard Wis. JI——Civil 3260.1. We do, however, note the comments to Wis. JI——Civil 3260.1 suggest the legislature abandoned the consumer-

22

¶37 At first blush, CMC's final argument regarding the challenge in reading Wis. Stat. § 895.047(1)(a) within the entirety of § 895.047 provides more substantive contentions, but we dispose of the argument because of para. (a)'s plain language and para. (b)'s codification of the common law.  CMC asserts that para. (a)'s language "not reasonably safe" cannot be read in harmony with para. (b)'s "unreasonably dangerous."  But, just as we can identify that para. (a) codifies language from the Restatement (Third), we also can identify (b)'s "unreasonably dangerous" language as a codification of the consumer-contemplation test from this state's common law.  See e.g., Dippel, 37 Wis. 2d 443; Vincer, 69 Wis. 2d 326; Green, 245 Wis. 2d 772.  This is where we recognize the legislature's retention of the consumer-contemplation test in the statute.  Scalia & Garner, supra, at 320 (describing canon of imputed common law meaning).

¶38 Further, Wis. Stat. § 895.047 presents the rare situation in which the legislature recorded its findings and intent in neighboring Wis. Stat. § 895.046, which also was created under Act 2.  While we need not consult legislative intent, we have done so to confirm a plain meaning analysis in the past.  Kalal, 271 Wis. 2d 633, ¶51.  In § 895.046(1g), the legislature recorded its intent in clarifying product liability

---

contemplation test and adopted the risk-utility test, which is problematic and incorrect.

23

law was in part "to return tort law to its historical, common law roots."[22]

¶39 As a final matter, we briefly address CMC's argument, noted earlier, that Wisconsin's product liability statute eliminates plaintiffs' ability to bring a claim in negligence for product design. To the contrary, Wis. Stat. § 895.047(6)

---

[22] Wisconsin Stat. § 895.046(1g) states:

Legislative findings and intent. The legislature finds that it is in the public interest to clarify product liability law, generally, and the application of the risk contribution theory of liability first announced by the Wisconsin Supreme Court in Collins v. Eli Lilly Co., 116 Wis. 2d 166[, 342 N.W.2d 37] (1984), specifically, in order to return tort law to its historical, common law roots. This return both protects the rights of citizens to pursue legitimate and timely claims of injury resulting from defective products, and assures that businesses may conduct activities in this state without fear of being sued for indefinite claims of harm from products which businesses may never have manufactured, distributed, sold, or promoted, or which were made and sold decades ago. The legislature finds that the application of risk contribution to former white lead carbonate manufacturers in Thomas v. Mallett, [2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523], was an improperly expansive application of the risk contribution theory of liability announced in Collins, and that application raised substantial questions of deprivation of due process, equal protection, and right to jury trial under the federal and Wisconsin constitutions. The legislature finds that this section protects the right to a remedy found in [A]rticle I, [S]ection 9, of the Wisconsin Constitution, by preserving the narrow and limited application of the risk contribution theory of liability announced in Collins.

§ 895.046(1g).

plainly states the products liability section "does not apply to actions based on a claim of negligence or breach of warranty." Such claims establish their provenance outside of § 895.047, and the statute does not extinguish a plaintiff's ability to bring a claim in negligence against a product manufacturer.

¶40 Therefore, Wis. Stat. § 895.047(1) enumerates five criteria a plaintiff must establish in a defective design claim against a manufacturer.[23]  Despite Restatement (Third), a plain language reading of para. (a) establishes two requirements, noted above.  The statute in other paragraphs codifies Wisconsin's commitment to the consumer-contemplation test (para. (b)), while also codifying this state's common law in paras. (c), (d), and (e).  Lastly, subsec. (6) does not preclude plaintiffs from bringing a common law negligent design claim when the plaintiff also alleges a strict liability cause of action against a manufacturer.

¶41 Although we decline to adopt any of Restatement (Third) of Torts § 2 comments today, including comment f upon which the court of appeals extensively relied, the common law

---

[23] While _Dippel_, 37 Wis. 2d 443, establishes five requirements for a product liability claim under § 402A, and Wis. Stat. § 895.047(1) also enumerates five requirements, the statute tracks the following changes: First, § 895.047(1) does not include one requirement from _Dippel_ "(4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller;" _id._ at 460, and secondly, of course, § 895.047(1) includes para. (1)(a), the language of which is borrowed from the Restatement (Third) of Torts § 2.

25

pre-2011 continues to provide persuasive authority in products liability cases.[24]

---

[24] The Sumnicht factors may be persuasive in regard to the reasonableness of a design and are:

> 1) [C]onformity of defendant's design to the practices of other manufacturers in its industry at the time of manufacture; 2) the open and obvious nature of the alleged danger; . . . 3) the extent of the claimant's use of the very product alleged to have caused the injury and the period of time involved in such use by the claimant and others prior to the injury without any harmful incident. . . . 4) the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive; and 5) the relative likelihood of injury resulting from the product's present design.

Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 372, 360 N.W.2d 2 (1984) (citing Collins v. Ridge Tool Co., 520 F.2d 591, 594 (7th Cir. 1975)).

### C. Summary Judgment

¶42 This brings us to the court of appeals' decision to reverse the circuit court's grant of summary judgment in CMC's favor. "Every decision on a motion for summary judgment begins with a review of the complaint to determine whether, on its face, it states a claim for relief." Butler, 294 Wis. 2d 397, ¶18 (citing Hoida, Inc. v. M&I Midstate Bank, 2006 WI 69, ¶16, 291 Wis. 2d 283, 717 N.W.2d 17). If it does, "we examine the answer to see if issues of fact or law have been joined." Butler, 294 Wis. 2d 397, ¶18. When the "complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a prima facie case for summary judgment." Id. Any factual dispute will not necessarily preclude summary judgment, only disputes of material fact will do so. Id. Accordingly, we review whether Murphy's complaint asserted (1) a strict product liability claim under Wis. Stat. § 895.047, and (2) a negligent design claim against CMC.

¶43 To prevail under the strict product liability claim, Murphy, a line technician, must demonstrate all of the five statutory factors: First, the foreseeable risks of the Dixie tongs could have been reduced or avoided by the adoption of a reasonable alternative design and CMC's omission of a reasonable alternative design rendered the Dixie tongs not reasonably safe. Murphy's expert witness, Dr. John DeRosia, opined that "[t]here are several alternative designs that do not share the single point of failure flaw of the Dixie lifting tongs. One device,

27

manufactured by Hogg-Davis . . . uses multiple teeth on each side of the tongs. The [Hogg-Davis] tongs also incorporate a locking mechanism that prevents them [from] opening inadvertently."[25]  DeRosia also explained:

> An advantage of the Hogg-Davis tongs would be that the weight of the tongs, over 22 pounds, would tend to push the tongs open completely, allowing the teeth of the tongs to engage fully.  In [an attached photo showing the tongs holding a suspended pole], the top four of the six teeth are embedded into the wood of the pole. The bottom two teeth, being closer together than the teeth above also act to trap the pole and prevent the pole from escaping.  If a failure of the grasp of the upper four teeth occurs, the bottom teeth would prevent the pole from falling out of the grasp of the tongs."[26]

¶44 Accordingly, Murphy provided evidence that the Dixie tongs, by their defective design of a single attachment point on each side of the pole, presented foreseeable risks that a pole could fall out of the tongs' grasp.  DeRosia points to a reasonable alternative design that features multiple contact surfaces, and an additional set of teeth below the teeth contacting a suspended pole that would serve to catch the pole if a clamp failed.  DeRosia also describes the smaller opening at the bottom of the Hogg-Davis tongs that prevents loss of a clamped pole.  DeRosia opined that the Dixie tongs' omission of additional teeth or contact surfaces renders the Dixie tongs not reasonably safe.

---

[25] R. 42 at 4.

[26] R. 154 at 6.

28

¶45 DeRosia also opined that the Dixie tongs failed to address the foreseeable risk that a long, heavy pole would tilt or teeter when lifted by tongs with a single point on either side. DeRosia's reports sufficiently support the theory that a reasonable alternative design, such as the six, half-inch-long teeth of the Hogg-Davis tongs, would reduce or avoid the foreseeable risks posed by a tilting pole.

¶46 Second, the Dixie tongs' defect rendered the product unreasonably dangerous to persons or property under the consumer-contemplation standard. Under that test, "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Vincer, 69 Wis. 2d at 331. At the time of Murphy's accident, CMC advertised the Dixie tongs as "Lifting tongs [] used to lift logs and poles into place. Lifting tongs are certified and tested for overhead lifting."[27] Further, the pole that fell on Murphy was 600 pounds, well within the Dixie tongs' 2,500 pound workload rating. Given that Murphy was not lifting a load beyond the tongs' rated maximum, and that the tongs are advertised for lifting poles, and certified for overhead lifting, he provided evidence that an ordinary consumer would not anticipate anything more than the inherent dangers of working with a heavy, suspended load. Line technicians would not expect the Dixie tongs to pose a danger beyond what they

---

[27] R. 42 at 4.

could contemplate, such as the tongs losing gripping force based on a teetering pole. Accordingly, based on the evidence Murphy presented, an ordinary consumer of Dixie tongs would not contemplate the dangers posed by the Dixie tongs' unsafe design. Murphy survives on para. (b) as well.

¶47 The last factor in Murphy's strict product liability claim, that the defective design was a cause of Murphy's damages, is supported by DeRosia's opinion, but is contested by CMC, who has raised Murphy's conduct as a cause of his injuries. CMC also had its own expert witness who did not concur in DeRosia's judgment. This does not defeat Murphy's claims but it may create disputes of material facts in regard to his strict products liability claim for a defectively designed product.[28]

¶48 To prevail on the negligent design claim, Murphy must establish a traditional negligence claim that CMC owed him a duty, that the Dixie tongs' design did not meet the standard of care that duty required, and therefore CMC breached its duty, which caused his injuries. Collins v. Eli Lilly Co., 116 Wis. 2d 166, 181-82, 342 N.W.2d 37 (1984); see also Wis. JI——Civil 1005.

¶49 CMC's answer denies all elements of the claims, although it concedes it manufactured the Dixie tongs at issue in Murphy's injuries. CMC also asserts Murphy was contributorily negligent as a matter of law, which CMC contends precludes his

---

[28] Whether the pole would have fallen from an alternative design tongs, e.g., the Hogg-Davis tongs, is a contested material fact.

30

recovery. Therefore, CMC argues, it is entitled to summary judgment as a matter of law.

¶50 A review of the record suggests the parties dispute: (1) whether Murphy stood beneath or to the side of the pole as it fell; (2) whether Murphy's hands were outstretched to right the pole or on the remote control; (3) how high Murphy lifted the pole; (4) where Murphy attached the tongs on the pole, relative to the two critical points; and (5) whether Murphy conducted a test lift. Because there are these and other disputes of material fact, summary judgment is not appropriate.

¶51 Furthermore, "[a]s a general rule . . . the existence of negligence is a question of fact which is to be decided by the jury," as are questions of reasonability, and apportionment of negligence. Ceplina v. S. Milwaukee Sch. Bd., 73 Wis. 2d 338, 342, 243 N.W.2d 183 (1976); accord Dottai v. Altenbach, 19 Wis. 2d 373, 375, 120 N.W.2d 41 (1963) ("It is a rare case when summary judgment can be granted in an action grounded on negligence"); Schuh v. Fox River Tractor Co., 63 Wis. 2d 728, 744, 218 N.W.2d 279 (1974) ("Generally, the apportionment of negligence is for the jury."). Because there are disputed issues of material fact, we affirm the court of appeals in reversing summary judgment and remand for further proceedings.

### III. CONCLUSION

¶52 In interpreting Wisconsin's product liability statute when the claim is for a defective design, we conclude as follows: (1) Wis. Stat. § 895.047(1)(a) requires proof of a more safe, reasonable alternative design the omission of which

31

renders the product not reasonably safe; (2) proof that the consumer-contemplation standard as set out in § 895.047(1)(b) (for strict liability claims for a defective design) has been met; and (3) proof that the remaining three factors of a § 895.047(1) claim have been met.  The statute's plain language is clear in showing that the legislature codified the common law consumer-contemplation standard in § 895.047(1)(b).  We disagree with the court of appeals' conclusion that the legislature discarded the consumer-contemplation test by incorporating the risk-utility balancing test.  We also decline to adopt comment f, upon which the court of appeals relied.  With a clear understanding of the requirements that a plaintiff must establish, and considering the multiple genuine disputes of material fact, which we have explained above, we affirm the court of appeals in reversing summary judgment and remand to the circuit court for further proceedings.

*By the Court.*—The decision of the court of appeals is affirmed.

¶53 JILL J. KAROFSKY, J. *(concurring)*. I agree that both Murphy's strict liability design defect claim and common law negligence claim survive the motion for summary judgment because Murphy has introduced material issues of fact on each of the claims' elements.[1] However, I write to clarify the relationship between Wis. Stat. § 895.047 and the common law, as well as the application of that law to the facts of this case.

¶54 I begin my concurrence by laying out the historic common law test for a design defect claim, particularly focusing on the "defect" and "unreasonably dangerous" elements of the claim. Next, I interpret Wis. Stat. § 895.047, which establishes the current test for a design defect claim, and delineate which aspects of the current test draw from the common law. Finally, I apply the elements of the statutory test found in § 895.047(1)(a) and (1)(b) to the facts of this case and determine, as the majority/lead opinion has, that Murphy has established disputed issues of material fact for each element.

---

[1] The majority/lead opinion states that in order to prevail on its negligent design claim, Murphy will need to establish the elements of a traditional negligence claim. See majority/lead op., ¶48. With regard to the "duty" elements, I note that Wisconsin has long followed the minority view set forth in the dissent of Palsgraph. Rockweit by Donahue v. Senecal, 197 Wis. 2d 409, 419-20, 541 N.W.2d 742 (1995) (discussing Palsgraph v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928) (Andrews, J. dissenting)). Pursuant to this approach, everyone owes to the world at large the duty of exercising ordinary care. Hartleberg v. Norwest Bank Wis., 2005 WI 109, ¶17, 283 Wis. 2d 234, 700 N.W.2d 15. Thus, in Wisconsin, the test is whether the "defendant failed to exercise ordinary care and the act or omission complained of was the cause of the plaintiff's injury." Hoida, Inc. v. M & I Midstate Bank, 2006 WI 69, ¶22, 291 Wis. 2d 283, 717 N.W.2d 17; see, also Wis JI-Civil 1005.

## I. The Common Law Test

¶55 Prior to 2011, a litigant seeking to prove a design defect claim looked to the consumer contemplation test, derived from common law, to satisfy two elements of the claim: (1) that the design was "defective," and (2) that the product was "unreasonably dangerous." See Green v. Smith & Nephew AHP, Inc., 2001 WI 109, ¶29, 245 Wis. 2d 772, 629 N.W.2d 727 ("[A]lthough defect and unreasonable danger are distinct elements to a claim in strict products liability, both elements are based on consumer expectations.").

¶56 To prove a product design "defective" under the consumer contemplation test, a litigant was required to show that the product was "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 69 Wis. 2d 326, 330, 230 N.W.2d 794 (1975)(quoting Restatement (Second) of Torts § 402A, cmt. g).

¶57 To prove a product design was "unreasonably dangerous" under the consumer contemplation test, a litigant was required to show that the product design was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Vincer, 69 Wis. 2d at 331 (quoting Restatement (Second) of Torts § 402A cmt. i).

## II. The Current Test

¶58 In 2011 the legislature enacted Wis. Stat. § 895.047. This statute retains the common law distinction between the

2

"defect" and "unreasonably dangerous" elements. Importantly, this statute also abrogates the consumer contemplation test for the "defect" element of the claim. Section 895.047 reads as follows:

> (1) Liability of Manufacturer. In an action for damages caused by a manufactured product based on a claim of strict liability, a manufacturer is liable to a claimant if the claimant establishes all of the following by a preponderance of the evidence:
>
>> (a) That the product is defective because it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. . . . A product is defective in design if the foreseeable risk of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe. . . .
>
>> (b) That the defective condition renders the product unreasonably dangerous to persons or property.
>
>> (c) That the defective condition existed at the time the product left the control of the manufacturer.
>
>> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.
>
>> (e) That the defective condition was a cause of the claimant's damages.

¶59 Section (1)(a), the defect element, clearly and unambiguously sets out the test for when "[a] product is defective in design." Instead of codifying the common law consumer contemplation test, the legislature adopted language from the Restatement (Third) of Torts that requires "defect" be

3

proved through the submission of a reasonable alternative design, the omission of which renders the product not reasonably safe.

¶60 This statutory test for "defect" is incompatible with the common law consumer contemplation test. Specifically, the statute is silent as to consumer contemplation, while the common law test required that the product be in a condition "not contemplated" by the consumer. The statute focuses on whether a manufacturer adopted a reasonable alternative design, rendering a consumer's contemplation of a product's condition irrelevant. Clearly, section (1)(a) abrogates the common law with regard to the "defect" element. See Wis. Mfrs. and Com. v. Evers, 2022 WI 38, ¶15, 977 N.W.2d 374 (stating that statutory language that establishes a general rule applicable to all relevant claims cannot coexist with contrary common law).

¶61 While section (1)(a) addresses the "defect" element and replaces the common law "defect" test, section (1)(b) codifies the "unreasonably dangerous" element of the claim and remains consistent with the common law consumer contemplation test. Under the consumer contemplation test, the "unreasonably dangerous" element of a strict liability claim merely defines what it means to be "unreasonably dangerous." Because the legislature continued using the term "unreasonably dangerous" without further definition or explanation, I conclude that the common law continues to inform our understanding of that term in this context.

III. Application of the Current Test

4

¶62 Having parsed out the two elements of a design defect strict liability claim at issue here, I now analyze whether Murphy established issues of material fact on both of those elements. I do so to further bolster and clarify the majority/lead opinion's analysis. Like the majority/lead opinion, I conclude Murphy has established issues of material fact and his claims must survive summary judgment.

¶63 Under Wis. Stat. § 895.047(1)(a), the "defect" element, Murphy is required to show that "the foreseeable risk of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." To meet his burden, Murphy asserts that the Hogg-Davis tongs are a reasonable alternative design to the Dixie tongs. Murphy points to his expert witness, who testified that the Hogg-Davis tongs have three features that reduce the foreseeable risk that a pole will fall from the tongs and cause injury. First, Murphy's expert testified that the Hogg-Davis tongs have multiple teeth on each side of the device which create redundancy in the clamping mechanism. Thus, if one tooth slips out of a pole, the other teeth remain embedded. R. 154, pg 6. This redundancy is particularly important when handling weathered and worn poles, which are more likely to slip out of a tooth's grasp. Second, Murphy's expert also testified that the Hogg-Davis tongs have superior clamping force. R. 116, pg 25-28. Third, both Murphy's and CMC's expert discussed that the Hogg-Davis tongs include a locking mechanism absent in Dixie

tongs that would keep the tongs from opening in the event a tooth slips. R. 68, pg 19; R. 118, pg 17-20. According to Murphy, these features reduce the foreseeable risk that a pole will fall from the tongs, and the omission of these features renders Dixie tongs not reasonably safe.

¶64 CMC disputes the claim that Hogg-Davis tongs have superior clamping force and questions whether the multiple teeth of the Hogg-Davis tongs or the inclusion of the locking mechanism actually lead to a lower failure rate. These are disputed issues of fact that preclude summary judgment on the "defect" element.[2]

¶65 Under Wis. Stat. § 895.047(1)(b), the "unreasonably dangerous" element, Murphy is required to show that "the defective condition renders the product unreasonably dangerous to persons or property." Murphy offers that lack of redundancy makes the Dixie tongs too likely to fail, especially when lifting old and weathered poles. Additionally, according to Murphy, the inadequate clamping force of the Dixie style tongs means the teeth are less likely to fully embed into poles and may slip at high rates. Finally, Murphy argues that the absence of the Hogg-Davis style locking mechanism allows Dixie tongs to dangerously open and drop poles at higher rates than tongs that include the additional locking mechanism. This is because the

---

[2] The court of appeals in this case looked to the Restatement (Third) of Torts comment (f) to apply the reasonable alternative design portion of this test. While it is unnecessary to adopt comment (f) in this case, I would not foreclose the use of the Restatement's comments, including comment (f), as persuasive in future cases.

6

only force holding Dixie tongs closed is the downward force of the weight of the pole itself——if a tooth slips, the tongs open and the pole drops. Murphy contends that these dangers are beyond the scope of what an ordinary consumer would expect.

¶66 For a product to be unreasonably dangerous, it must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Vincer, 69 Wis. 2d at 331 (quoting Restatement (Second) of Torts § 402A cmt. i). This is an objective test from the perspective of a reasonable consumer of pole tongs, here, a utility worker.

¶67 Given the emphasis on safety procedures in occupations like Murphy's, it can be assumed that a reasonable utility worker expects a pole lift to be somewhat dangerous. Lift failures must be anticipated on some level. However, it is unclear whether a reasonable utility worker expects that these failures stem only from user error or if utility workers reasonably anticipate that the tongs' teeth may slip, even if the tongs are placed and used correctly. The potential for grip failure when tongs are used correctly may be beyond the scope of what an ordinary utility worker would contemplate. CMC's own expert appears to say that if tongs (of any style) are attached correctly, they should not slip and drop a pole. See R. 118, pg 19.

¶68 Furthermore, a lift device could still be unreasonably dangerous even though lift failures may not be entirely avoidable. A lift device that fails at significantly higher

7

rates than other devices may be dangerous beyond the level that is contemplated by the consumer. It is not clear from the record whether a reasonable utility worker would expect pole tongs to fail more often when used on worn and weathered poles. Yet there is evidence in the record from Murphy's expert that pole tongs do, in fact, fail more often when they are used on old and weathered poles. These implicate questions of fact for a jury, and thus summary judgment cannot be granted on the "unreasonably dangerous" element on this record.

¶69 Although it may be a close call, Murphy has introduced evidence that consumers expect pole tongs to grip and hold a pole if placed correctly and expect pole tongs to grip and hold worn and weathered poles. There is no evidence in the record from either side indicating exactly what a utility worker would consider to be a reasonable lift failure rate, but Murphy contends the failure rate is too high. In summary, a device which fails at higher than usual rates or unexpectedly fails under certain circumstances may still be dangerous beyond consumer expectations. Here, Murphy has raised enough of an issue to allow a jury to consider it.

¶70 As to the final three elements, CMC does not dispute that Murphy has met the requirements under (1)(c) or (1)(d), so it is unnecessary to analyze those elements further. I agree with the majority/lead opinion's analysis of the (1)(e) causation element and so do not reproduce that analysis here.

IV. Conclusion

8

¶71 In conclusion, Wis. Stat. § 895.047(1)(a) abrogates the common law test for what makes a design "defective" in a strict liability design defect claim, but (1)(b) retains the common law consumer contemplation test for what makes a design "unreasonably dangerous." Murphy has established a disputed issue of material fact for both of those elements and thus the claim must survive CMC's motion for summary judgment.

¶72 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join this concurrence.

¶73 BRIAN HAGEDORN, J. *(concurring in part, dissenting in part).* This case involves a negligence claim and a strict liability claim against Columbus McKinnon Corporation (CMC) alleging that CMC's Dixie tongs were defectively designed. A majority of this court concludes CMC is not entitled to summary judgment and sends both claims back to the circuit court. While I agree that the negligence claim can proceed, I part ways with respect to the strict liability claim. Reviewing the undisputed material facts in this case, Matthew Murphy has failed to present any evidence establishing that the Dixie tongs were unreasonably dangerous under Wis. Stat. § 895.047(1)(b). Therefore, I would grant CMC's motion for summary judgment on the strict liability claim.

## I. WISCONSIN STAT. § 895.047

¶74 In 2011, the legislature modified in part and codified in part the common law elements of a strict liability claim based on a design defect. See 2011 Wis. Act 2, § 31; Wis. Stat. § 895.047(1). Under the statute, a plaintiff must establish each of the following:

> (a) That the product is defective because it . . . is defective in design . . . . A product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe. . . .
>
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
>
> (c) That the defective condition existed at the time the product left the control of the manufacturer.

1

(d) That the product reached the user or consumer without substantial change in the condition in which it was sold.

(e) That the defective condition was a cause of the claimant's damages.

§ 895.047(1).

¶75 As the majority/lead opinion notes, the backdrop to this enactment was debate in this court over whether we should jettison the consumer contemplation test adopted from the Restatement (Second) of Torts and instead adopt the reasonable alternative design test described in the Restatement (Third) of Torts: Products Liability § 2.[1] The legislature weighed in and created a unique hybrid test via the enactment of Wis. Stat. § 895.047(1). This case focuses on the meaning and application of the elements described in paragraphs (a) and (b).

¶76 Paragraph (a) requires two showings. First, a plaintiff must prove "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer." Wis. Stat. § 895.047(1)(a). Second, a plaintiff must prove "the omission of the alternative design renders the product not reasonably safe." Id. The reasonable alternative design language is copied nearly word for word from the Restatement (Third) of

---

[1] See Green v. Smith & Nephew AHP, Inc., 2001 WI 109, ¶¶122-34, 245 Wis. 2d 772, 629 N.W.2d 727 (Sykes, J., dissenting) (advocating for adoption of Restatement (Third) of Torts: Products Liability § 2 as a change from the court's current common law test); Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 2009 WI 78, ¶¶76-110, 319 Wis. 2d 91, 768 N.W.2d 674 (Prosser, J., concurring) (same); Horst v. Deere & Co., 2009 WI 75, ¶¶87-104, 319 Wis. 2d 147, 769 N.W.2d 536 (Gableman, J., concurring) (same).

Torts: Products Liability § 2(b).[2] This was, quite consciously, a legislative policy decision to depart from the consumer contemplation test this court borrowed from the Restatement (Second) of Torts and embrace the reasonable alternative design test from the Restatement (Third) of Torts——at least in part. The parties debate whether we should adopt particular comments from the Restatement (Third) of Torts to further clarify the meaning of the reasonable alternative design test——comment f in particular. But the legislature did not explicitly incorporate any particular comments, and we need not do so in order to decide this case.[3]

¶77 The legislature also created Wis. Stat. § 895.047(1)(b), which requires proof that "the defective condition rendered the product unreasonably dangerous to persons or property." This is a separate condition, and it contains no

_____

[2] The Restatement (Third) of Torts: Products Liability § 2(b) provides:

> A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe . . . .

The only difference between the two is that the Restatement (Third) focuses on the seller or distributor of the product and Wis. Stat. § 895.047(1)(a) focuses on the manufacturer. The legislature chose to address the liability of sellers and distributers in subsec. (2) of § 895.047 by referencing to the same standards for manufacturer liability in subsec. (1).

[3] These comments may very well prove persuasive and useful when applying the reasonable alternative design test. We simply leave those questions for another day.

reference, direct or indirect, to the Restatement (Third) of Torts or any other test. This element was not created out of thin air, however. Under our cases, a strict liability design defect claim required this very thing: proof that the product was unreasonably dangerous. And the test under our common law was the consumer-contemplation test. See Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 69 Wis. 2d 326, 332, 230 N.W.2d 794 (1975) (adopting the consumer contemplation test to determine if a product was unreasonably dangerous). Without any textual evidence of a departure from the common law, this statutory addition is best read as codifying the common law test to determine whether a product is unreasonably dangerous.[4]

¶78 Finally, of particular relevance in this case, the legislature's modifications to the test for strict liability explicitly exempted application to negligence claims. See Wis. Stat. § 895.047(6) ("This section does not apply to actions based on a claim of negligence or breach of warranty."). Therefore, the ordinary principles of common law negligence remain unaltered by these legislative changes.

## II. APPLICATION

¶79 Murphy advances two claims against CMC for its allegedly defective design of Dixie tongs: negligence and

---

[4] Another tricky question we leave for another day concerns the proper test for determining whether "the omission of the alternative design renders the product not reasonably safe" under Wis. Stat. § 895.047(1)(a), and to what degree daylight exists between a product that is "not reasonably safe" under para. (a) and "unreasonably dangerous" under para.(b).

strict liability. With respect to Murphy's negligence claim, CMC does not develop separate arguments based on traditional negligence principles. Therefore, its summary judgment motion on the negligence claim fails. But CMC does maintain that Murphy has presented insufficient evidence on his strict liability claim to survive summary judgment. To that, I now turn.

¶80 The parties in this case focused largely on the proper law we should apply, and in that vein, the briefs gave most of their attention to the reasonable alternative design requirement in Wis. Stat. § 895.047(1)(a). However, after reviewing the record, I conclude that Murphy has failed to marshal any evidence that the Dixie tongs are unreasonably dangerous under Wis. Stat. § 895.047(1)(b). For that reason, CMC is entitled to summary judgment on its strict liability claim.[5]

¶81 Once again, to determine if a product is unreasonably dangerous under Wis. Stat. § 895.047(1)(b), we look to the common law consumer contemplation test. We have described that test as follows:

> [W]hether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product. If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and

---

[5] "Summary judgment is appropriate when there is no genuine issue of material fact and 'the moving party is entitled to judgment as a matter of law.'" Quick Charge Kiosk LLC v. Kaul, 2020 WI 54, ¶9, 392 Wis. 2d 35, 944 N.W.2d 598 (quoting Wis. Stat. § 802.08(2)).

5

> defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer, although his knowledge may be evidence of contributory negligence under the circumstances.

Vincer, 69 Wis. 2d at 332.

¶82 This framework calls attention to the end-user of the product. The product in this case is not designed for homeowners building a backyard shed or children tinkering with Tonka trucks. The Dixie tongs at issue here are designed to lift and move poles weighing up to 2,500 pounds in highly specialized construction work. This is no average consumer product. The consumer contemplation test in this case therefore must focus on the objective awareness and knowledge of the specially trained workers who use this product. See id. at 331 ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (quoting Restatement (Second) of Torts, § 402A cmt. i)).[6] The question, therefore, is what a specialist like Murphy would reasonably understand concerning the danger of using this product. No one doubts that lifting and moving massive poles is fraught with danger. But the risk of danger or even death does not mean that a product is <u>unreasonably</u> dangerous to the end-user. If mere danger sufficed, every chainsaw, extension ladder, and construction

---

[6] Accord Kaiser v. Johnson & Johnson, 947 F.3d 996, 1002, 1014 (7th Cir. 2020) (noting that for purposes of determining if a transvaginal mesh medical device is unreasonably dangerous under Indiana law "the relevant consumers here are pelvic-floor surgeons").

6

vehicle would qualify. That is not the law. The test requires that we ask whether the end-user of the product would "reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury." Id. at 332. If so, even a dangerous product is not unreasonably dangerous under our common law, and by extension, under Wis. Stat. § 895.047(1)(b).

¶83 So we turn to the evidence offered to see whether there is any evidence from which a jury could find the Dixie tongs are unreasonably dangerous based on the expectations of the someone like Murphy——a line technician who is trained to use these types of pole-lifting products. Murphy argues that the Dixie tongs are unreasonably dangerous because the tongs only have two points of contact and therefore do not have a redundancy. Murphy also notes that CMC knew: (1) the Dixie tongs were used to lift poles; (2) the attendant danger that a dropped pole could kill or injure someone; and (3) that workers guide poles with one hand while using the Dixie tongs. Murphy's expert, John DeRosia, stated in his report,

> If a single failure occurs, i.e., the grip of a tooth on one side of the tongs, the tongs will no longer grasp the pole which will fall with potentially dangerous consequences. Other than the engagement of the teeth the tongs do not have a mechanism to capture the pole.[7]

---

[7] CMC asks us to disregard DeRosia's expert testimony as untested speculation. This is, in effect, a request for the court to rule on its Daubert motion that remains pending before the circuit court. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). I agree with the majority/lead opinion that we should not address this issue because it is not properly before us.

7

DeRosia continued that this "problem is exacerbated with wooden poles that are weathered" and that in order to manipulate the pole while lifting it, the "worker is in close proximity to the pole."

¶84 This evidence, if proven, may demonstrate that the Dixie tongs could have perilous consequences should something go wrong or that the design could have been improved. But it is insufficient to demonstrate that the Dixie tongs are unreasonably dangerous based on the expectations and dangers the end-user would reasonably expect. Notably, none of this evidence addresses the expectations of line technicians like Murphy who use the Dixie tongs. The average user of Dixie tongs would undoubtedly appreciate the inherent danger posed by their use. As DeRosia notes, Dixie tongs are advertised for overhead lifting of logs and poles. The summary judgment record reflects that Murphy received extensive safety training on how to properly use Dixie tongs; the danger of error would not be lost on him or others using the product. The record further reflects that CMC is not aware of anyone else who has been injured while using Dixie tongs. It is not investigating any alleged incidents nor are there any other lawsuits relating to Dixie tongs. During his deposition, DeRosia also testified that he had not investigated a single prior incident where someone was injured while using the Dixie tongs. In short, while Murphy introduced evidence of the inherent risk of danger, he produced nothing from which a reasonable juror could conclude that Dixie

tongs are unreasonably dangerous based on the objective and known risks to someone who uses them.

¶85 The majority/lead opinion disagrees. It states that because "Murphy was not lifting a load beyond the tongs' rated maximum, and that the tongs are advertised for lifting poles, and certified for overhead lifting, he provided evidence that an ordinary consumer would not anticipate anything more than the inherent dangers of working with a heavy, suspended load." Majority op., ¶46. This argument is difficult to follow. It does not say anything about what an ordinary user of the product would reasonably anticipate other than that the product contains inherent dangers. But as already explained, that's not the test under Wis. Stat. § 895.047(1)(b).

¶86 The concurrence reaches the same conclusion but for different reasons. It relies on the absence of evidence to conclude summary judgment is improper. For example, the concurrence points to the fact that the record is unclear with respect to "whether a reasonable utility worker would expect pole tongs to fail more often when used on worn and weathered poles." Concurrence, ¶68. And it relies on the fact that there is no evidence "indicating exactly what a utility worker would consider to be a reasonable lift failure rate." Id., ¶69. But on summary judgment, Murphy must offer some evidentiary basis to counter the undisputed evidence that Dixie tongs are not unreasonably dangerous. The fact that Murphy has failed to do so is precisely why CMC's motion for summary judgment should be granted.

9

III.  CONCLUSION

¶87  In order to prevail on his strict liability claim, Murphy must establish all of the requirements of Wis. Stat. § 895.047(1).  The undisputed material facts in the record show that the Dixie tongs are not unreasonably dangerous as a matter of law under § 895.047(1)(b).  Accordingly, summary judgment should be granted to CMC on Murphy's strict liability claim.  I respectfully dissent from the court's resolution of the strict liability claim, but concur with its conclusion on Murphy's negligence claim.

¶88  I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice REBECCA GRASSL BRADLEY join this concurrence/dissent.