COURT OF APPEALS
DECISION
DATED AND FILED

December 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP1711**

STATE OF WISCONSIN

Cir. Ct. No.  2021CV85

IN COURT OF APPEALS
DISTRICT IV

CHARLES AKER,

   PLAINTIFF-APPELLANT,

V.

GOOD SPORTSMAN MARKETING, LLC,
DICK'S SPORTING GOODS, INC.,
AND PREMIER OUTDOOR EQUIPMENT, LLC,

   DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Vernon County: TIMOTHY J. GASKELL, Judge. *Reversed and cause remanded for further proceedings.*

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

¶1    GRAHAM, J. This is a products liability case about a safety harness system that was designed to prevent hunters from sustaining injuries if

they fall from their tree stands, but that did not prevent Charles Aker from falling to the ground, resulting in injuries. Aker appeals the circuit court order that granted summary judgment in favor of the defendants, Good Sportsman Marketing, LLC, Dick's Sporting Goods, Inc., and Premier Outdoors Equipment, LLC, and that dismissed Aker's product liability claims for failure to warn, which were founded in strict liability and negligence.

¶2      Unlike some harness systems on the market, the harness system at issue here was not designed to be used with a carabiner (that is, a metal ring with a spring-loaded safety closure that is used to connect components). For purposes of summary judgment, it is undisputed that Aker misused the system by connecting its component parts with a carabiner. It is further undisputed that Aker would not have fallen had he connected the component parts in the manner provided in the instructions that came with the harness system when sold. Aker argues that the defendants are nevertheless liable for his injuries because the harness system lacked adequate warnings, rendering it defective. Specifically, Aker argues, the manner in which he misconnected the system was reasonably foreseeable, and the defendants could have prevented his misuse and resulting injury by affixing a warning to the loop on the harness system to which Aker attached the carabiner. Based on our review of the record, we conclude that there are genuine disputes of material fact that preclude a grant of summary judgment, and we reverse and remand to the circuit court for further proceedings consistent with this opinion.

## BACKGROUND

¶3      The following facts, which are derived from the pleadings, depositions, and discovery responses, are undisputed unless otherwise noted.

¶4      Aker is an avid outdoorsman who has enjoyed hunting for more than fifty years.  He maintains a number of tree stands on his property, and he always uses a harness system when hunting from a tree stand.

¶5      At the time of his injury, Aker owned and was using a harness system that was sold under the brand name "Muddy Outdoors."  At all times relevant to this appeal, each of the defendants was "in the business of selling, distributing and/or manufacturing" Muddy-brand harness systems, including the specific system at issue here.  We sometimes refer to that system as the "subject harness system."

¶6      The subject harness system consisted of two main components that are relevant to this appeal: a full-body harness and a tree strap.  The harness is worn around the user's body and has a tether affixed to its back.  The tree strap, sometimes referred to as a tree belt, is wrapped around the tree and fastened with a buckle.  The harness system is designed to secure the harness that the user is wearing to the tree strap via the tether.  That way, even if the user falls off the tree stand, the harness system should prevent the user from falling to the ground.

¶7      On the day of his injury, Aker was using the subject harness system to hunt from a tree stand on his property.  He was wearing the harness and, after ascending to the platform of the stand, he buckled the tree strap around the tree and connected the tether on the harness to the tree strap.  In so doing, Aker used a carabiner to connect a loop at the end of the tether to a loop that he located on the tree strap.  However, the loop on the tree strap was not intended to be weightbearing; it was instead intended to function as a tab that can be pulled to release the buckle on the tree strap.  We refer to this loop on the tree strap as the "buckle release loop" throughout this opinion.

¶8 Some hunting harness systems are designed to be connected with carabiners, and others are not. The subject harness system was not designed to be connected with a carabiner, and the manufacturer did not include a carabiner in the package. Instead, according to the instructions that were included in the package, a user is supposed to connect the tether to the subject tree strap by threading the unbuckled tree strap through the loop on the tether and then buckling the tree strap around the tree. This method of connection is pictured in the instructions as follows:



Therefore, according to the instructions, Aker should have threaded the subject tree strap through the loop on the tether, rather than using a carabiner to connect the tether to the buckle release loop.

¶9 On the day in question, after connecting the tether to the buckle release loop, Aker sat in the tree stand and eventually fell asleep. As we

understand it, his body began to lean to one side, which caused the tether to become taut and to pull against the carabiner and buckle release loop. At some point, the buckle release loop broke under Aker's weight. Aker fell to the ground and was seriously injured.

¶10 Aker filed a complaint alleging that the defendants are liable for his injuries based on their role in manufacturing, selling, or distributing the subject harness system. The complaint alleges two causes of action, one founded in strict products liability and the other founded in negligence. Specifically, Aker alleges that the subject harness system was defective because it did not contain adequate warnings, and that the lack of warnings caused his injuries. *See Tanner v. Shoupe*, 228 Wis. 2d 357, 368, 596 N.W.2d 805 (1999) (a manufacturer has a duty to warn against a reasonably foreseeable misuse of a product). The defendants denied liability, alleging, among other things, that Aker's contributory negligence was the primary cause of his injuries.

¶11 The case proceeded to discovery, and the primary disputes related to the apportionment of fault between Aker and the defendants. Specifically, the parties disputed whether the defendants should have anticipated that some users might attempt to connect the components of the subject harness system in the manner that Aker did, and whether the defendants should have attempted to prevent that potential misuse of the product through product warnings.

¶12 Aker was deposed, and his testimony cut both ways. Among other things, he agreed that it was a "bad idea" to "modify," "alter," or "substitute[e]" components that came with the harness system. And he acknowledged that he regularly used the subject Muddy harness with a tree strap that was made by a different manufacturer. The tree strap that Aker regularly used employed a

5

"Prusik knot" (a friction hitch that forms a loop and holds tightly when weighted), which was designed to be connected to the tether with a carabiner. The reason that Aker was using the Muddy tree strap that came with the subject harness system on the day he was injured, rather than his Prusik knot tree strap, was because someone else was using his Prusik knot tree strap that day.[1]

¶13 Aker further testified that he had owned various harness systems over the years, including another system manufactured by Muddy, and that he had "always" used carabiners successfully with his harness systems. He had connected the subject harness with the Prusik knot tree strap with a carabiner "hundreds" of times and never had a problem. Aker testified that he thought that the carabiner he used "came with" the subject harness system, and, on the day of his injury, he assumed that the buckle release loop was intended for a carabiner connection because it was "the only loop [he] saw" on the subject tree strap.

¶14 Aker acknowledged that he did not review the instructions for the subject harness system on the day of his injury, and further testified that he read the instructions only once, when he initially purchased the product. After reviewing the subject harness system's instructions during his deposition, Aker acknowledged that they were "clear" on the "right way" to use the harness system and that they unequivocally did not call for a carabiner.

¶15 In support of his claim that the product lacked adequate warnings, Aker disclosed the report of his expert witness, Robert Sugarman, and the

---

[1] In its written decision, the circuit court refers to this Prusik knot tree strap as "homemade." That characterization appears to be incorrect. When counsel referred to the tree strap as "homemade" during Aker's deposition, Aker testified that the tree strap "was not homemade," but that he could not recall who had manufactured it.

defendants took Sugarman's deposition. Sugarman is an engineer and an expert in the field of "human factors." His primary opinion was, in essence, that the manner in which Aker misused the subject harness system was foreseeable and that the defendants should have affixed a warning directly to the buckle release loop that would have warned users against that specific misuse.

¶16    Among other things, Sugarman's opinion was based on the fact that some hunting harness systems are designed to be used with a carabiner. Based on this, he opined that the defendants should have anticipated that some users of the subject harness system would be familiar with how carabiner-based systems work. As we understand it, with a carabiner-based system, the user employs a carabiner to connect the tether on the harness directly to a weight-bearing loop on the tree strap. Sugarman's opinion was that the design of the subject tree strap, which included the buckle release loop, could induce users familiar with carabiner-based systems to believe that they could attach the tether on their harness directly to that loop. Sugarman referred to this phenomenon as "negative transfer," which is when a person misuses a product by applying "previously learned behaviors" to a "different, but functionally similar" product.

¶17    Sugarman opined that, on the day of his injury, Aker applied his previous experience with carabiners and carabiner-based systems to the subject harness system and assumed that he could use a carabiner to secure his tether to the only loop he found on the tree strap, which was not designed to bear his weight. According to Sugarman, this was a "foreseeable hazard" that the defendants should have anticipated, and "[a] remedy and mitigation for the hazard would be to place a warning label directly on the [buckle release loop]," which would have "guarantee[d] that the critical warning would be observed any time the tree strap was employed."

7

¶18 Good Sportsman Marketing's chief operations officer, Brent Quiring, was also deposed, and he testified that he did not think it was foreseeable that a consumer would mistakenly attach a carabiner to the buckle release loop of the subject harness system. Quiring acknowledged that Muddy manufactures carabiner-based systems in addition to harness systems like the one Aker was using, and that the tree straps on both types of systems incorporate a loop as part of their design. However, Quiring testified, Muddy designs its products with the expectation that "the user is reading the instructions and following the instructions." Here, Quiring testified, the instructions that come with the subject harness system are "very clear on how to hook it up" and do not involve a carabiner or the buckle release loop.

¶19 Quiring further testified that Muddy employed a "third-party human factors expert" to help write the instruction manual and the warnings on the product itself. Among other things, the warnings affixed to the harness stated, "WARNING Failure to read and follow manufacturer's instructions may result in serious injury or death," and the instructions in the package cautioned users "not [to] remove, modify and/or omit any portion" of the product. According to Quiring, if the user employed a carabiner that was not included in the packaging, the user would be disregarding the instructions and "alter[ing] the product." In Quiring's view, it would be "very uncommon" that customers would fail to read the instructions because a harness system is "obviously a product … that is intended to stop you from having a serious accident" and Quiring "would think every user would want to know exactly how to use it." Quiring testified that there was no need for a warning on the buckle release loop and that Muddy did not consider placing a warning there.

¶20     The defendants moved for summary judgment, arguing that the undisputed facts demonstrate that Aker's injury was caused by his "misuse [of] and substantial change to the product," as well as "his failure to follow written warnings and instructions." Aker opposed the motion, arguing that there are genuine disputes of fact as to whether his misuse of the product was a "reasonably foreseeable hazard" that defendants should have accounted for with a warning. Aker also filed an affidavit that provided additional information about the circumstances surrounding his injury; we discuss this affidavit in more detail in the discussion below.

¶21     The circuit court granted the defendants' motion for summary judgment and dismissed Aker's strict liability and negligence claims. It stated that Aker's injury could not have been "avoided by … [a] warning," and that "[i]t would not have been possible for defendants to foresee" that a consumer would "disregard the explicit instructions" or "[use] a component … not supplied by the manufacturer." The court also determined that, for these same reasons, Aker's causal responsibility exceeded that which could be attributed to the defendants, which precluded his strict liability and negligence claims alike. Finally, with respect to the strict liability claim, the court determined that it failed for an additional reason based on the elements set forth in WIS. STAT. § 895.047(1) (2023-24).[2]  Specifically, the court determined that by using a carabiner, Aker "substantially changed" the subject harness system from the condition in which it was sold, which represents a bar to liability under § 895.047(1)(d). Aker appeals.

---

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

**DISCUSSION**

¶22    We independently review an order granting a motion for summary judgment, applying the same methodology that circuit courts apply. *Racine County v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶24, 323 Wis. 2d 682, 781 N.W.2d 88.    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).    We view the facts in the light most favorable to the nonmoving party, *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 512, 383 N.W.2d 916 (Ct. App. 1986), and "if more than one reasonable inference can be drawn from the undisputed facts, [then] summary judgment is not appropriate," *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶47, 305 Wis. 2d 538, 742 N.W.2d 294.

¶23    We begin by summarizing some of the products liability principles that are pertinent to the parties' dispute, and we then apply these principles to the facts from the summary judgment filings.

**I.  Legal Principles**

¶24    Products liability law is based on the premise that manufacturers have a responsibility to provide "safe consumer products," and that liability may arise if a manufacturer's product is defective and the defect causes injury. *Godoy v. E.I. du Pont de Nemours & Co.*, 2009 WI 78, ¶15, 319 Wis. 2d 91, 768 N.W.2d 674; *see also* WIS. STAT. § 895.047(2) (providing that sellers and distributors may also be liable under certain circumstances).   In Wisconsin, products liability claims can be based on any of three categories of defects: manufacturing defects, design defects, and defects based on a failure to adequately warn. *Id.*, ¶29.  A

warning defect claim is based on the premise that, although the product was "designed and manufactured to be as safe as possible," the product contains a "hidden danger" of which the consumer should have been warned. *Tanner*, 228 Wis. 2d at 367.

¶25 Claims based on warning defects may be founded in strict liability or negligence. *See Morden v. Continental AG*, 2000 WI 51, ¶¶42-44, 235 Wis. 2d 325, 611 N.W.2d 659. Strict liability and negligence are "separate avenues of recovery," and for the most part, have "substantively different" elements of proof. *Godoy*, 319 Wis. 2d 91, ¶16 n.7. Generally, strict liability claims "focus[] on the nature of the defendant's product." *Id.* By contrast, negligence claims focus on "the defendant's conduct," *id.* (citation omitted), and whether the defendant exercised ordinary care in warning of the risks posed by the product, *Morden*, 235 Wis. 2d 325, ¶¶53-54. *See* WIS JI—CIVIL 3242; *see also D.L. v. Huebner*, 110 Wis. 2d 581, 610, 329 N.W.2d 890 (1983) ("At the heart of a negligence action is the actor's conduct. The focus in a strict liability case, on the other hand, is on the product itself.").

¶26 The elements of a strict liability claim, which must be established by a preponderance of the evidence, are found in WIS. STAT. § 895.047(1). Under § 895.047(1)(a), as pertinent here, a plaintiff must establish that the product "is defective because of inadequate instructions or warnings." This first element turns on foreseeability—it requires the plaintiff to show that the product posed "foreseeable risks of harm" that could have been "reduced or avoided by the provision of reasonable instructions or warnings" and that "the omission of [such] instructions or warnings render[ed] the product not reasonably safe." § 895.047(1)(a). The plaintiff must also show that: the defect in warning "rendered the product unreasonably dangerous to persons or property"; the defect

11

"existed at the time the product left the control of the manufacturer"; "the product reached the user or consumer without substantial change in the condition in which it was sold"; and the defect "was a cause of the claimant's damages." § 895.047(1)(b)-(d).

¶27 A negligence claim, by contrast, is grounded in "Wisconsin common law." *See Murphy v. Columbus McKinnon Corp.*, 2022 WI 109, ¶32, 405 Wis. 2d 157, 982 N.W. 898. Like strict liability claims, negligence claims also turn, in part, on foreseeability. *Tanner*, 228 Wis. 2d at 367 n.3. Specifically, the manufacturer has a duty to exercise ordinary care, which includes the duty to warn of hidden dangers that result from foreseeable uses and misuses of the product. *See id.* at 367-68; *see also* WIS JI—CIVIL 3242. Therefore, as with strict liability, a plaintiff bringing a negligence claim must show that the injury-causing product posed "foreseeable" risks of harm that the manufacturer could have anticipated. *See Tanner*, 228 Wis. 2d at 367 n.3; *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 742, 218 N.W.2d 279 (1974) ("foreseeable use is a requirement for a case in strict liability in tort, just as it is in negligence or warranty cases").

¶28 "Contributory negligence" refers to the role that the plaintiff's own negligence played in causing the injury. Plaintiffs are not required to prove that they were free from negligence, *Morden*, 235 Wis. 2d 325, ¶73, but a plaintiff's contributory negligence may be an affirmative defense to strict liability and negligence claims alike. *See* WIS. STAT. § 895.045(3); *Mohr v. St. Paul Fire & Marine Ins. Co.*, 2004 WI App 5, ¶37, 269 Wis. 2d 302, 674 N.W.2d 576 (2003); *Morden*, 235 Wis. 2d 325, ¶¶73-76. Contributory negligence operates as a form of comparative fault, barring recovery if the plaintiff's share of fault exceeds that which is attributed to the defendants. In strict liability claims, recovery is barred if the plaintiff's causal responsibility "is greater than the percentage resulting from

12

the defective condition of the product," *see* § 895.045(3)(b), and in negligence claims, recovery is barred if the plaintiff's negligence is "greater than the negligence of the [defendant] against whom recovery is sought," *see* § 895.045(1).

## II. Aker's Claims

¶29    Having outlined the relevant legal principles, we now turn to Aker's claims. As mentioned, for the purpose of summary judgment, the following facts are undisputed. Aker was injured when the buckle release loop on the subject harness system broke. The buckle release loop broke because Aker misused the harness system by connecting the tether of his harness to the buckle release loop with a carabiner and placing weight on that connection. The instructions for the subject harness system did not call for the use of a carabiner and explained how to properly connect the harness to the subject tree strap, but Aker did not review those instructions on the day of his injury. There were no warnings on the subject tree strap itself that would have alerted Aker that the buckle release loop was not intended for carabiner attachment and was not strong enough to bear his weight.

¶30    Based on these facts, the defendants argue that Aker's claims fail as a matter of law for the same reasons given by the circuit court: (1) the manner in which Aker misused the subject harness system was not reasonably foreseeable; (2) Aker's causal responsibility exceeded that which could be attributed to the defendants; and (3) Aker "substantially changed" the harness system from the condition in which it was sold by adding a carabiner, such that he could not satisfy the element of a strict liability claim under WIS. STAT. § 895.047(1)(d). Aker argues that there are genuine disputes of fact that preclude granting summary judgment on each of these grounds.

## A. Reasonable Foreseeability

¶31     We begin with the defendants' argument that the undisputed facts establish that Aker's misuse of the product was not reasonably foreseeable.

¶32     As discussed, regardless of whether the claim is based on strict liability or negligence, a warning defect claim turns in part on whether the product posed a risk of harm that was reasonably foreseeable. *See* WIS. STAT. § 895.047(1); *Tanner*, 228 Wis. 2d at 365 n.3. If a plaintiff "used the product in a manner other than its intended use" and is injured as a result of "that abnormal use," "liability should not follow *unless the abnormal use was itself foreseeable*." *See Schuh*, 63 Wis. 2d at 742 (emphasis added). Accordingly, our case law recognizes that in some instances, it may be foreseeable that consumers will misuse a product in certain ways, such that the manufacturer is required to warn consumers against those potential misuses. *See Tanner*, 228 Wis. 2d at 367-68 (citations omitted) (manufacturers are expected to "anticipate the environment which is normal for the use of [the] product," which includes "all reasonable uses and misuses" of the product and "the resulting foreseeable dangers").

¶33     Aker contends that there is a genuine dispute of fact as to whether his act of using a carabiner to attach the tether on his harness to the tree strap's buckle release loop was a reasonably foreseeable misuse of the subject harness system. We agree. As discussed, there are at least two types of harness systems that are common in the market—carabiner-based systems, in which a loop on the tree strap is meant to bear the weight of the user, and a non-carabiner system like the subject harness, in which there is no loop on the tree strap that is meant to bear weight. Based on the phenomenon of "negative transfer," Sugarman opined that it was foreseeable that some of the defendants' potential users would transfer their

14

knowledge of carabiner-based systems to the subject harness system and tree strap. Specifically, Sugarman opined, it was foreseeable that such users would mistakenly conclude that they could use a carabiner to connect their tether with the buckle release loop on the subject harness system. Although Quiring did not agree with Sugarman's conclusions, he acknowledged that carabiners are a "central" part of the design of some hunting harness systems and estimated that carabiner-based systems make up roughly a quarter of all systems on the market. Considering these facts in the light most favorable to Aker, we conclude that they are sufficient to create a genuine dispute of fact regarding whether Aker's misuse of the subject harness system was reasonably foreseeable.

¶34    We now turn to the defendants' several arguments to the contrary. The defendants first assert that an average user would not disregard "explicit instructions and ample warnings on how to properly and safely use the subject safety harness." In essence, the defendants argue that it was not foreseeable that a consumer would mistakenly connect the tether to the buckle release loop with a carabiner because it was not foreseeable that a consumer would ignore or fail to read the pertinent instructions which explain how to properly connect the harness and tree strap.

¶35    We see some intuitive appeal to this argument. As Quiring observed in his deposition, a harness system is a product "that is intended to stop [users] from having a serious accident," and users as a general matter "would want to know exactly how to use it." Thus, given the nature of the product, it may be true that a manufacturer could reasonably expect that many of its potential users would review the instructions in the package carefully prior to using the subject harness system. Even so, it was not unforeseeable as a matter of law that some potential users might forego reading the package instructions, or might read them too

15

quickly without paying sufficient attention to detail. Further, a review of Wisconsin cases demonstrates that manufacturers risk liability if they fail to anticipate that some users might not heed certain product warnings and instructions.[3] And, pertinent here, a user's failure to read package instructions may be especially likely if the user is operating out of a mistaken belief that, based on the user's prior experience with similar products, the user already understands how the product is intended to be used.

¶36 The defendants next argue that, based on two uncontroverted facts from Quiring's deposition testimony, there can be no genuine dispute of fact that Aker's misuse of the subject harness system was unforeseeable. These facts are that Muddy employed a "human factors expert" who considered foreseeable misuses as part of its process of designing the warnings and instructions for the subject harness system; and that, aside from Aker, Muddy has not received any other reports of any user mistakenly attaching a carabiner to the buckle release loop.

¶37 Even assuming that the jury credits Quiring's uncontroverted testimony on these points, neither fact is sufficient to leave "no room for controversy" on whether Aker's misuse of the subject harness system was foreseeable. *See Kraemer Bros., Inc. v. U.S. Fire Ins. Co.*, 89 Wis. 2d 555, 566, 278 N.W.2d 857 (1979). A jury might reasonably conclude that, despite being

---

[3] *See Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 737-40, 218 N.W.2d 279 (1974) (reasoning that a jury could conclude that a warning on a crop blower that the plaintiff did not heed was not adequate due to its placement); *see also Tanner v. Shoupe*, 228 Wis. 2d 357, 377-79, 596 N.W.2d 805 (Ct. App. 1999) (reasoning that "a general warning is not necessarily adequate to warn of a specific danger," such that a jury might reasonably conclude that an unheeded instruction to wear eye protection was not adequate to warn users about the vulnerability of a vent cap that resulted in an explosion).

employed to consider foreseeable misuses during the design process, Muddy's expert failed to adequately account for a misuse that the expert should have reasonably foreseen. And the lack of documented reports of this specific misuse does not necessarily mean that other users do not make the same mistake that Aker made. Like a seat belt or air bag, the integrity of a hunting harness connection might not be tested unless and until the user experiences what could otherwise be a catastrophic accident. Therefore, a user who misunderstands how the subject harness system was designed to be connected may not discover their mistake—and may not report it to Muddy—unless the user actually suffers a significant injury in a fall.

¶38    Finally, the defendants argue that the theory of "negative transfer" is disproved by Aker's own deposition testimony, which shows that Aker did not negatively transfer knowledge "from any Muddy safety harness design." As best as we understand it, the argument is as follows. According to his deposition testimony, Aker regularly used a tree strap that featured a Prusik knot, rather than the tree straps that came with his hunting harness systems. As mentioned, there is evidence that the Prusik knot-style tree strap, which was made by an unknown manufacturer, was designed to be used with a carabiner, and that Aker had been able to successfully use a carabiner to connect his harness to the Prusik knot-style tree strap in the past. Therefore, the defendants argue, Aker did not learn to use a carabiner from "an old Muddy harness [system]," and his decision to use a carabiner on the day of his injury was instead due to his choice "to not use the manufacturer-supplied components."

¶39    This argument fails for at least the following reasons. First, when considering reasonable foreseeability, the question is what manufacturers can reasonably anticipate about the use or misuse of their products by their customer

17

base and other potential users of their products. The particular circumstances of any specific user's history with similar products does not drive the inquiry into what would be reasonably foreseeable to the manufacturer.

¶40    To elaborate on this point, for purposes of reasonable foreseeability, the issue here is whether the defendants could have foreseen that a consumer might misuse the subject harness system by attaching a carabiner to the buckle release loop. As we explained above, a jury could determine that it was foreseeable that some potential users might misuse the subject harness system in this manner. This is because carabiner-based systems are common in the marketplace, and there are key similarities between the subject harness system and the carabiner-based systems—namely, that both systems involve a tree strap with a loop. Such a determination about what was reasonably foreseeable to the defendants would not turn on facts that are particular to Aker's individual history with harness systems, and for purposes of reasonable foreseeability, it is not especially relevant how and where Aker actually obtained his prior knowledge about how harness systems are supposed to work. While these and other facts about Aker's circumstances, history, and conduct might be relevant to the jury's assessment of his contributory negligence, they do not resolve the issue of reasonable foreseeability.

¶41    Second, and relatedly, we see no reason that the identity of the manufacturer of Aker's prior harness systems is material to an assessment of reasonable foreseeability. The assessment instead turns on the likelihood that some of Muddy's customers will have had prior experience with carabiner-based systems—whether manufactured by Muddy or some other manufacturer—and the likelihood that these customers might fall back on their prior experience when using the subject harness system.

¶42     Accordingly, regardless of whether Aker's individual decision to use a carabiner stemmed from his prior experience with a tree strap made by Muddy or some other manufacturer, a jury could conclude that the defendants should have foreseen that the buckle release loop on the subject tree strap presented a hidden hazard to consumers familiar with carabiner-based systems. We therefore reject the defendants' argument that Aker's deposition testimony somehow forecloses his reliance on Sugarman's opinion about negative transfer.

¶43     Before closing on this point, we pause to address the parties' dispute over an affidavit that Aker filed in opposition to summary judgment, which the circuit court referred to as a "sham affidavit." The disputed issue is whether the "sham affidavit rule" precludes consideration of Aker's affidavit, in which he averred that he had previously owned a Muddy-brand harness system that was designed to be used with a carabiner. As we have just explained, for purposes of a reasonable foreseeability analysis, the source of Aker's prior knowledge of carabiner-based systems is immaterial, and therefore any factual dispute over the features of Aker's prior harness system is likewise immaterial. We nevertheless briefly address this issue here because it is addressed in the parties' appellate briefing; it may resurface in any proceedings following the remand in this case; and our research has revealed relatively few citable Wisconsin cases that provide guidance on what constitutes a "sham affidavit."

¶44     A "sham affidavit" is an affidavit that is submitted in opposition to a motion for summary judgment, and that purports to create an issue of material fact by averring facts that "directly contradict[]" an affiant's prior deposition testimony with no reasonable explanation for the contradiction. *See Yahnke v. Carson*, 2000 WI 74, ¶¶15-18, 236 Wis. 2d 257, 613 N.W.2d 102. In the few citable cases on the topic, Wisconsin courts have strictly applied the "direct contradiction"

requirement and have determined that the requirement is met if the affidavit and the deposition testimony conflict such that the sworn statements cannot both be true. *Yahnke* provides a useful illustration. In that case, a medical malpractice plaintiff's medical expert signed an affidavit in which the expert opined that the doctor violated the standard of care, despite the prior deposition testimony in which the expert acknowledged that the defendant doctor did not violate the standard of care. *Id.*, ¶¶4, 6. For other illustrations, *compare* **Brophy v. Mei**, No. 2009AP194, unpublished slip op. ¶¶23-25 (WI App Jan. 12, 2010) (a landlord's affidavit averring that he never failed to return "any security deposit" directly contradicted his deposition testimony that "on at least one occasion he failed to return a security deposit"), *with* **Humfeld v. State Farm Fire & Cas. Co.**, No. 2017AP2522, unpublished slip op. ¶¶22-23 (WI App July 1, 2018) (a party's affidavit averring that he had been "expressly invited" to hunt did not contradict the party's deposition testimony, in which the party made no mention of an "express invitation").[4]

¶45 Turning to the present case, during his deposition, Aker testified that he had previously owned another Muddy-brand harness system. When asked whether the harness Aker was wearing when he had his accident was "similar or the same as [Aker's] old Muddy harness," Aker responded "I'd say similar." Then, when counsel sought to clarify whether the two harnesses were "identical or were there some differences," Aker responded: "That I can't tell you." At other points in the deposition, Aker testified that, to his knowledge, a carabiner was included in the package of the subject harness system, and that he had "always"

---

[4] We cite these authored, unpublished opinions for their persuasive value pursuant to WIS. STAT. RULE 809.23(3)(b).

used carabiners with the harnesses that he owned, including, presumably, with the Muddy harness that he had previously owned.

¶46    Then, when Aker filed an affidavit along with his summary judgment materials, Aker averred that the Muddy harness system he had previously owned "was a different type" than the subject system, in that his prior system was designed to be "used [with] a carabiner." Aker further averred that, "[o]n the date of the incident, [he] believed the safety harness [he] was wearing worked the same as the safety harness [he] had worn previously[,] including the need for a carabiner," and that, "[a]fter suffering [his] injury, [he] learned that [the subject harness system] does not use a carabiner."

¶47    Based on this record, we do not agree with the circuit court's determination that Aker's affidavit was a "sham." There was no contradiction, much less a direct one, between Aker's deposition testimony and his affidavit. As stated, in his affidavit, Aker averred that his prior harness system "used a carabiner," and that on the day of his injury, he thought that the subject harness system "worked the same" as the Muddy system that he previously owned. This is generally consistent with Aker's deposition testimony. At most, the slight differences suggest that Aker's understanding of how the subject harness system was supposed to be used evolved as he obtained new information during the litigation. Specifically, based on our review of the deposition testimony, one reasonable interpretation is that Aker may not have understood that he had misused the subject harness system until the later part of his deposition, when the defendants' counsel led him through the package instructions. That is, it appears that by the time Aker filed his affidavit, he had come to understand something that he did not fully understand when he was deposed—that the subject harness system was different from his prior systems in that the method for attaching the tether to

the subject tree strap did not involve the use of a carabiner. This evolution in Aker's understanding would readily explain the slight differences between the affidavit and the deposition testimony, and does not render the affidavit a sham.[5]

¶48 Accordingly, for all the reasons explained above, we conclude that the summary judgment materials establish a genuine factual dispute regarding whether Aker's misuse of the subject harness system was reasonably foreseeable.

## B. Contributory Negligence

¶49 The defendants also argue that Aker bears a greater share of causal responsibility for his injuries than the defendants as a matter of law, and therefore, his contributory negligence precludes any recovery. Based on the existing summary judgment record, we conclude that the contributory negligence issue presents a jury question and cannot be decided by a court on summary judgment.

¶50 As noted, contributory negligence is a defense to both strict liability and negligence claims, and specifically concerns whether the injured party's

---

[5] We reject the circuit court's sham affidavit determination for the reasons stated above, but we now comment on an additional problem with the defendants' assertion that Aker's affidavit is inconsistent with his deposition testimony. As we understand it, the difference between the two systems that could matter related to the design of the tree strap in each system, including the method by which the tether was supposed to be connected to the tree strap. However, defendants' counsel did not ask Aker to testify about differences in the design of the tree straps, or even about differences in the harness systems as a whole. Instead, the questioning focused exclusively on the harness alone. Specifically, counsel showed Aker exhibits depicting the images on the package of the subject harness system and asked: "The harness which is depicted in [these exhibits], the one involved in your accident, was that similar [to] or the same as the old Muddy harness you got or is it different, do you recall?" Aker responded that his prior harness was "similar" to the subject harness, and he identified some differences in the snaps that were used to fasten the leg straps of the harness. Counsel did not follow up to ask whether there were any other differences in the harnesses aside from the snaps, nor did counsel ask whether there were any differences in any other components of the harness systems, such as the tree straps.

"conduct" can be said to be a "legally contributing cause" of the harm. *See **Brown v. Dibbell***, 227 Wis. 2d 28, 41, 595 N.W.2d 358 (1999). An injured party's contributory negligence will preclude a strict liability claim if the injured party's negligence "is greater" than what can be attributed to the defective condition of the product, WIS. STAT. § 895.045(3)(b), and will preclude a negligence claim if the injured party's negligence is "greater than the negligence of the person against whom recovery is sought," § 895.045(1).

¶51 Wisconsin courts have consistently held that the question of contributory negligence is generally within "the special province of the jury." *See, e.g.*, ***Gross v. Denow***, 61 Wis. 2d 40, 48, 212 N.W.2d 2 (1973); ***Young v. Anaconda Am. Brass Co.***, 43 Wis. 2d 36, 45, 168 N.W.2d 112 (1969); ***Smith v. St. Paul Fire & Marine Ins. Co.***, 56 Wis. 2d 752, 755, 203 N.W.2d 34 (1973). It is only when evidence of the injured party's negligence is "so clear" and of a quantum "so great" that a court should determine that the injured party's negligence was greater than the defendants as a matter of law. *See **Johnson v. Grzadzielewski***, 159 Wis. 2d 601, 608, 465 N.W.2d 503 (Ct. App. 1990).

¶52 Although the defendants acknowledge that contributory negligence is generally a jury question, they point out that Wisconsin courts have resolved this issue as a matter of law when the plaintiff's conduct is "intentional and extreme." The defendants point to ***Peters v. Menard, Inc.***, 224 Wis. 2d 174, 589 N.W.2d 395 (1999), a wrongful death case that, the defendants contend, supports their position. In that case, Peters was caught shoplifting at a retail store, and employees of the store pursued Peters on foot. *Id.* at 178-80. Peters jumped into a flooded river to escape their pursuit, and was carried away by the current and drowned. *Id.* at 181-82. Peters' estate brought a wrongful death claim against the store, and the circuit court granted summary judgment in the store's favor. *Id.* at

182. Our supreme court affirmed the grant of summary judgment. *Id.* at 196. The court explained that "[t]he substantial risk inherent in jumping into a plainly flooded river with fast moving current would be apparent to an ordinarily prudent person," and that "Peters failed to exercise ordinary care for his own safety" by "intentionally and voluntarily entering the [river]." *Id.* Under the circumstances, the court reasoned, Peters' behavior was "unreasonable and dangerous" and "exceeded any negligence which could be placed on the [employees chasing him] as a matter of law." *Id.* at 197-98.

¶53 The defendants contend that Aker's actions "were similar" to the actions of the plaintiff in *Peters*. We disagree. Here, unlike the plaintiff in *Peters*, the summary judgment materials do not suggest that Aker's actions were so "unreasonable" or "dangerous" that we are prepared to say that his negligence exceeded that of the defendants "as a matter of law." *See id.* Nor does Aker's conduct resemble the negligent conduct of the plaintiffs from any of the other seminal cases on contributory negligence that the defendants cite.[6] Instead, viewing the facts in the light most favorable to Aker, a factfinder might fairly conclude that Aker's misuse of the product did not exhibit an "intentional" or

---

[6] *See Johnson v. Grzadzielewski*, 159 Wis. 2d 601, 606-09, 465 N.W.2d 503 (Ct. App. 1990) (the plaintiff's negligence exceeded that of the defendant elevator company and elevator technicians as a matter of law because plaintiff intentionally disabled elevator safety mechanisms); *Jankee v. Clark County*, 2000 WI 64, ¶¶88-90, 235 Wis. 2d 700, 612 N.W.2d 297 (concluding that as a matter of law, the plaintiff was more responsible for his fall from a three-story building than the defendants because plaintiff understood that his conduct in attempting to escape through the window and failing to "comply with his medication program" was dangerous).

The defendants also cite to a per curiam opinion, and to an unpublished opinion that was issued in 1998. These citations violate the rules of appellate procedure. *See* WIS. STAT. RULE 809.23(3)(a)-(b) (providing that unpublished opinions may not be cited as persuasive authority unless "issued on or after July 1, 2009," and that unpublished per curiam opinions may not be cited). We remind counsel that violations of the rules of appellate procedure may lead to the imposition of sanctions.

"grossly negligent" disregard for his own safety. As mentioned, there is evidence in the summary judgment materials that Aker thought he understood how the subject harness system worked and believed that he was using it correctly when he attached his carabiner to the buckle release loop. Thus, unlike the plaintiff in *Peters* who deliberately put himself in obvious danger, a jury might determine that Aker was attempting to exercise appropriate care for his safety.

¶54 The defendants ask us to consider the nature of the activity and the product at issue, namely that there are serious risks associated with hunting from a tree stand; that Aker was aware of these risks; and that Aker still chose not to review the package instructions on the day of his injury and used a carabiner that had not been provided by the manufacturer. And, in an attempt to show that Aker's misuse of the product was "intentional and extreme," the defendants point out that on occasions before his injury, Aker regularly paired the subject Muddy harness with a Prusik knot-style tree strap that did not come with his Muddy harness. Given this history, the defendants contend, it was an "intentionally and grossly negligent decision" for Aker to proceed to use the subject tree strap with the subject harness "without ensuring [that] he knew how to use it." In other words, as we best understand it, the defendants are arguing that it was an "extreme" decision for Aker to not review the instruction manual to ensure that the subject tree strap could be attached to the harness with a carabiner, given that Aker was not using the tree strap that he normally used.

¶55 Based on the deposition testimony and other evidence from the summary judgment record, a jury might determine that Aker was negligent and that his negligence exceeded that of the defendants. Yet, the defendants do not persuade us that a jury would be bound to reach that decision, and for many of the same reasons, a jury might also assign fault to the defendants. That is, given the

25

serious risks associated with hunting from a tree stand and the potentially foreseeable risk that some users might not read or fully comprehend the package instructions, a jury might determine that the defendants, who were aware that a misuse of their product could result in injury or death, should have taken greater care with respect to warning users about any hidden risks.

¶56   In summary, we conclude that this is not one of those extreme cases in which the plaintiff's conduct was so unreasonable and dangerous that we can say it exceeded any negligence which could be placed on the defendants as a matter of law.

## C.  WISCONSIN STAT. § 895.047(1)(d)

¶57   We now turn to the defendants' argument about WIS. STAT. § 895.047(1)(d).   As mentioned, § 895.047 sets forth the elements of a strict liability claim, and paragraph (1)(d) provides that a plaintiff must prove "[t]hat the product reached the user or consumer without substantial change in the condition in which it was sold."  Here, the defendants argue that the subject harness system did not reach Aker "without substantial change in the condition in which it was sold" because Aker added his own carabiner to the subject harness system. Defendants point out that "the [subject harness system] was not provided with a carabiner," and they argue that "[t]here simply was no way to hook up the tether of the Subject Harness to the [buckle release loop on] the tree strap with the components provided with the product by the manufacturer."[7]

---

[7] During the summary judgment proceedings in the circuit court, the defendants also argued that Aker's strict liability claim might fail because he could not satisfy some of the other paragraphs in WIS. STAT. § 895.047(1).  The court did not address those arguments in its decision and the defendants do not renew those arguments on appeal.  We address them no further.

26

¶58 Whether the subject harness system reached Aker "without substantial change in the condition in which it was sold" is a question of statutory interpretation and application, which we consider de novo. *See McNeil v. Hansen*, 2007 WI 56, ¶7, 300 Wis. 2d 358, 731 N.W.2d 273. Statutory interpretation begins with the text of the statute, which is given its "common, ordinary, and accepted meaning." *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "Also relevant to a statute's plain meaning is prior case law interpreting the statute." *See Berkos v. Shipwreck Bay Condo. Ass'n.*, 2008 WI App 122, ¶8, 313 Wis. 2d 609, 758 N.W.2d 215.

¶59 Here, case law is especially relevant to our interpretation and application of WIS. STAT. § 895.047(1). As our supreme court explained in *Murphy*, 405 Wis. 2d 157, ¶31, the legislature created § 895.047(1) in 2011, and in so doing, it codified some aspects of the common law on strict products liability that "Wisconsin courts have developed and applied for decades." *Id.* As pertinent here, like § 895.047(1)(d), Wisconsin's common law test required that the product "reach the user or consumer without substantial change in the condition in which it [was] sold." *See Dippel v. Sciano*, 37 Wis. 2d 443, 459, 155 N.W.2d 55 (1967) (citation omitted). Accordingly, in interpreting § 895.047(1)(d), we rely on Wisconsin common law and our cases interpreting and applying that law.

¶60 One case that is particularly instructive is *Glassey v. Continental Ins. Co.*, 176 Wis. 2d 587, 500 N.W.2d 295 (1993). In *Glassey*, a worker was injured when a filler cap blew off the spray tank he was using and struck him in the forehead. *Id.* at 595. The filler cap was a replacement for the original cap that had come with the product and, unlike the original cap, the design of the replacement cap, among other things, did not allow the tank to be properly sealed.

27

*Id.* and 595-96. In affirming the dismissal of the worker's strict liability claim, our supreme court explained that the spray tank had "undergone a substantial and material change from the time it left the manufacturer." *Id.* at 600. Specifically, the court explained, "[a] substantial and material change is a change in the design, function, or character of the product linked to the accident," and here, the replacement of the filler cap was a "substantial and material change" because "[i]t was the replacement cap which blew off and caused Glassey's injuries." *Id.* at 600, 605.

¶61     The defendants argue that *Glassey* is analogous to the situation here. They point out that like the replacement cap that was added in *Glassey*, Aker's addition of the carabiner "changed how the [subject harness system] was designed to function." The defendants contend that by adding the carabiner, Aker altered the method of connection, which was a substantial and material change to the design of the harness system.

¶62     The defendants' argument might appear to have some merit at first blush. It is true that Aker changed the way that the product was designed to be used by adding the carabiner. Nevertheless, Aker's addition of the carabiner was not a "substantial" and "material" change for purposes of the bar to liability in WIS. STAT. § 895.047(1)(d). As our case law makes clear, the purpose of § 895.047(1)(d) is to "protect a manufacturer from liability when the *dangerously defective aspect of the product* was altered or introduced after the product left the manufacturer's control." *See Godoy*, 319 Wis. 2d 91, ¶46 (emphasis added). Here, although Aker introduced the carabiner, the carabiner did not fail and it was not the aspect of the subject harness system that allegedly made it "dangerously defective." Instead, the alleged dangerously defective aspect of the subject harness system was the buckle release loop on the tree strap, and the reason it was

28

dangerous was because it did not contain a warning to alert the user that it was not intended to be used with a carabiner or to bear weight. This aspect of the subject harness system indisputably existed at the time the product "left the manufacturer's control." This is distinguishable from *Glassey*, where the replacement filler cap was the dangerously defective aspect of the product, and it was added to the product after it left the manufacturer's control. *See also Haase v. Badger Mining Corp.*, 2004 WI 97, ¶¶32, 43, 274 Wis. 2d 143, 682 N.W.2d 389 (silica sand as sold was not dangerous but became dangerous "when it was fractured into dust by [the employer] during the foundry process").[8]

## CONCLUSION

¶63 For the reasons explained above, we conclude that there are genuine disputes of material fact that preclude summary judgment on Aker's strict liability and negligence claims. We therefore reverse the circuit court's grant of summary judgment and remand for further proceedings consistent with this opinion.

---

[8] Aker also appears to suggest that, as a matter of statutory interpretation, WIS. STAT. § 895.047(1)(d) was not meant to address alterations or modifications that a user makes to a product after the product is in the user's control, as was the case here. Aker points out that § 895.047(1)(d) explicitly provides that the product must "*reach*[] the user or consumer without substantial change in the condition in which it was sold." (Emphasis added.) He further points out that § 895.047(3) sets forth a list of defenses to strict liability claims, and paragraph (3)(c) provides that a claimant's damages "shall be reduced by the percentage of causal responsibility" that is attributable to the claimant's "misuse, alteration, or modification of the product." Accordingly, Aker argues, a user's alteration or modification of a product might reduce the award of damages, but it does not act as a wholesale bar to a strict liability claim pursuant to § 895.047(1)(d).

We need not address this argument because our conclusion that the alleged dangerously defective aspect of the harness system was unchanged from its original condition is dispositive. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (Ct. App. 2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.")

29

*By the Court.*—Order reversed and cause remanded for further proceedings.

Recommended for publication in the official reports.